507 A.2d 1215

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

v.

**Roger M. SIMON, Respondent.**

Supreme Court of Pennsylvania.

Argued Jan. 21, 1986.

Decided April 14, 1986.

Joshua D. Lock, Harrisburg, for respondent.

Albert M. Nichols, Chief Counsel, Edwin W. Frese, Jr., Asst. Disciplinary Counsel-in-charge, Harrisburg, for petitioner.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

Today we must determine the appropriate disciplinary sanctions to be imposed upon a member of the bar of this Commonwealth who has been convicted of federal drug charges.

In early 1982, Roger Simon (respondent), an attorney licensed to practice law in this Commonwealth, acted as a middle man for the sale and purchase of four ounces of cocaine. A client of respondent's, Michael Hasselhuhn, known as Big Mike, asked respondent if he could find

someone to purchase cocaine from a friend of his, who was known as "Trout." Respondent obtained a purchaser and went with Big Mike to the drug purchase armed with scales, a testing kit (known as a "hot box") and approximately $7,800–$8,000 to purchase the cocaine, which respondent would then deliver to the purchaser, one Ian Cohen. At the time of the drug purchase, one-half ounce of the cocaine was taken by Big Mike, with respondent's knowledge, to be sold on the streets and a cutting agent was substituted in its place. Respondent then delivered the cocaine to the purchaser, Ian Cohen. Respondent received no profit from the transaction.

Approximately one and one-half years later, in October, 1983, respondent was confronted by the FBI concerning the drug purchase. Respondent discussed his involvement with the FBI and with Assistant United States District Attorney David Shipman, but refused to relinquish the name of the purchaser at that time because the government did not give him any "concrete benefit" for doing so.

A two count indictment was handed-down against respondent and a not guilty plea was entered. After jury trial, respondent was found guilty, on February 14, 1984, in the United States District Court for the Middle District of Pennsylvania of unlawfully, willfully and knowingly conspiring to import, distribute and possess with intent to distribute, and unlawfully, knowingly and intentionally possessing with intent to distribute, a Schedule II controlled substance, cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1), respectively.[1]

1. § 846. Attempt and conspiracy
   Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
   21 U.S.C. § 846 (1982).
   § 841(a). Prohibited acts A
   Unlawful acts.
   (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

As to count I, respondent was sentenced to three months imprisonment and a fine of $1,000.[2]  As to count II, respondent was sentenced to a two year term of imprisonment, suspended, and placed on probation for two years, commencing on his release from imprisonment, subject to the condition that respondent perform 200 hours of community service work.  After sentencing, respondent was subpoenaed to appear before a grand jury.  It was only then, when his testimony could be compelled, that he divulged the name of the purchaser.

Upon notification of the conviction, a majority of this Court, by order dated May 21, 1984, immediately suspended respondent, pursuant to Pennsylvania Rule of Disciplinary Enforcement (Pa.R.D.E.) 214(d) which provides:

> Upon the filing with the Supreme Court of a certified copy of an order demonstrating that an attorney has been convicted of a crime which is punishable by imprisonment for one year or upward ... the Court may enter an order immediately suspending the attorney whether the conviction resulted from a plea of guilty of nolo contendere or from a verdict after trial or otherwise, pending final disposition of a disciplinary proceeding to be commenced upon such conviction.

The Office of Disciplinary Counsel (petitioner) then filed a petition for discipline against respondent on June 21, 1984. Petitioner charged respondent with violating the Code of Professional Responsibility which was adopted by this Court in 1974 and provides the minimum standards to which an attorney must adhere.  Specifically, petitioner charged respondent with misconduct under Disciplinary Rule (DR) 1–102.  That rule provides, in pertinent part, that a lawyer shall not "engage in illegal conduct involving moral turpi-

---

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

. . . . .

21 U.S.C. § 841(a) (1982).

**2.**  Respondent served a total of 81 days in a county jail while participating in a work-release program that allowed him to work five and one-half days a week, returning to jail in the evening.

tude; engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; engage in conduct that is prejudicial to the administration of justice; [or] engage in conduct that adversely reflects on his fitness to practice law." DR 1–102(A)(3), (4), (5) and (6), respectively. Respondent filed an answer admitting all the factual allegations.

To implement and enforce these standards for attorneys, this Court promulgated the Rules of Disciplinary Enforcement (Pa.R.D.E.). These rules, *inter alia*, provide:

**Rule 203. Grounds for Discipline**

(a) Acts or omissions by a person subject to these rules ... which violate the Disciplinary Rules, shall constitute misconduct and shall be grounds for discipline, whether or not the act or omission occurred in the course of an attorney-client relationship.

(b) The following shall also be grounds for discipline:

(1) Conviction of a crime which under Enforcement Rule 214 (relating to attorneys convicted of crimes) may result in [interim] suspension.

Further, under Pa.R.D.E. 204, attorney misconduct under the Code of Professional Responsibility is grounds for the imposition of discipline ranging from private informal admonition by Disciplinary Counsel to disbarment by this Court. Pa.R.D.E. 204(a)(1)–(6).

A three member hearing committee took testimony and heard arguments and, on March 22, 1985, found that respondent's conviction was a basis for the imposition of discipline, Pa.R.D.E. 203(b)(1), and that respondent had engaged in conduct prejudicial to the administration of justice, a violation of DR 1–102(A)(5). The committee recommended that respondent be suspended from the practice of law for eighteen (18) months, retroactive to May 21, 1984, the date of this Court's interim suspension order. The committee did not find a violation of the other disciplinary rules with which respondent had been charged.

The Disciplinary Board of the Supreme Court of Pennsylvania (Board) accepted the committee's findings of fact and conclusions of law in its report and recommendation to this

Court. However, the Board recommended that respondent be suspended until June 27, 1986, or upon completion of his federal probation. Subsequently, this Court issued a rule to show cause upon respondent why he should not be disbarred, pursuant to Pa.R.D.E. 208(e)(3). After briefs and oral argument, this Court finds that disbarment is warranted.

Our review of disciplinary matters is *de novo*. *Office of Disciplinary Counsel v. Troback*, 477 Pa. 318, 383 A.2d 952 (1978); *Office of Disciplinary Counsel v. Campbell*, 463 Pa. 472, 345 A.2d 616 (1975), *cert. denied*, 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976). The primary purpose of the disciplinary system is to "... determine the fitness of an attorney to continue the practice of law." *Office of Disciplinary Counsel v. Lucarini*, 504 Pa. 271, 281, 472 A.2d 186, 190 (1983).

A review of the record reveals the following facts. Respondent was admitted to practice law in 1973. Before and after graduation from law school, he was an employee of the Commonwealth.[3] Upon terminating this employment in 1976, respondent commenced private practice, and remained in private practice until his suspension in May, 1984.

During the time in question, spring 1981 through spring 1982, respondent experienced "personal problems." His wife lost her job. A subsequent business venture that she and respondent embarked on with others failed.[4] Respondent's father had suffered from a terminal illness and respondent assumed care of an emotionally disturbed first cousin who had been raised by respondent's family. Additionally, sometime in the fall of 1981, respondent discovered that his partner was stealing from the firm's escrow ac-

3. Initially, respondent was a special legal counsel to the Act 13 Flood Grant Program, Department of Community Affairs and then acted as counsel for the Pennsylvania Labor Relations Board, Department of Labor and Industry.

4. There is no indication on the record of the type of business entered into by respondent and his wife.

count and by January 1982, respondent severed his partnership and undertook his own practice.[5]

According to respondent, these problems caused him to feel that he had "no place to go" and he began to "hang around" with Big Mike as an "escape." Respondent admits that Big Mike was "immoral" and manipulative, yet he found him entertaining. Big Mike's "entertainment" included bragging to respondent how he would steal his father's drugs and sell them when he was in high school.

Big Mike approached respondent concerning the sale of approximately $8,000 worth of cocaine. According to respondent, he was approached because, "... he knew, obviously that I was a lawyer ..." and "... one of the people ... at that time who had associations with people with money, wealthy people." Respondent then supplied a purchaser for the cocaine.

Respondent's reasons for becoming involved in the drug deal were, "... I did it because I wanted to help both of them (the purchaser, Ian Cohen and the seller's agent, Big Mike). I did it because of the intrigue. It was a part of life I had never seen. I did it for the escape. I did it to see if I had the guts—this sounds stupid—to do something that was inherently dangerous." Respondent admits that he knowingly and intentionally took part in a "criminal and illegal" activity.

Respondent's defense was an attempt to show that he was basically a "good guy" and that his problems overwhelmed him. Respondent had a "close family." His father, brother and sister were also attorneys. He was active in social and religious affairs, helping Jewish immigrants resettle in Harrisburg and participating in various B'Nai B'Rith programs.

Respondent's practice was not financially renumerative and he depended, to an extent, on his wife's income. Re-

5. Respondent's partner was subsequently disbarred on consent and respondent was not, in any way, implicated in the events leading to his partner's disbarment.

spondent's reputation among his clients and colleagues was and remains good.

Respondent also added that when asked, six months later by the same purchaser, to procure more cocaine, he refused to do so; respondent's wife testified, however, that as to this refusal, respondent felt "guilty" in letting down his friend. There is no indication in the record why respondent, despite having a close family and playing an active role in his community and religion, could not or would not turn to them for his solace, rather than Big Mike.

When respondent was questioned by the FBI in October, 1983, he refused to relinquish the name of the purchaser. It was not until after sentencing, when subpoenaed before a grand jury, that respondent released the name.

■ We are guided by the Ethical Considerations set forth in our Code of Professional Responsibility which, although deemed "aspirational in character", represent the objectives toward which an attorney should strive and provide guidance for an attorney's behavior. *Code of Professional Responsibility*, Preamble and Preliminary Statement (1974).

"Maintaining the integrity and improving the competence of the bar to meet the highest standards is the ethical responsibility of every lawyer." *Code of Professional Responsibility* EC 1-1 (1974). "The public should be protected from those who are not qualified to be lawyers by reason of a deficiency in education or moral standards ... but who nevertheless seek to practice law." *Id.* EC 1-2 (1974). An attorney "... should refrain from all illegal and morally reprehensible conduct. Because of his position in society, even minor violations of law ... tend to lessen public confidence in the legal profession. Obedience to the law exemplifies respect for the law." *Id.* EC 1-5 (1974). Respondent's intentional participation in a conspiracy to distribute cocaine disregards each of these ethical considerations.

Respondent's conviction of this serious crime, for which imprisonment of one year or more could have resulted (Pa.R.D.E.214) warrants the imposition of discipline under Pa.R.D.E. 203(b)(1) and is conduct prejudicial to the administration of justice.[6] DR 1-102(A)(5).

Additionally, we believe that respondent's conduct involved moral turpitude (DR 1-102(A)(3)) and adversely reflected on his fitness to practice law (DR 1-102(A)(6)).[7]

"Moral turpitude is admittedly an elusive concept incapable of precise definition. Its definition may change with the times and vary from community to community." *State of Oklahoma Bar Ass'n v. Denton*, 598 P.2d 663, 665 (Okla. 1979). Legally, moral turpitude is defined as "... anything done knowingly contrary to justice, honesty, principle, or good morals." *Muniz v. State*, 575 S.W.2d 408, 411 (Texas 1978); *See also Black's Law Dictionary* 1359 (5th ed.1979).

Respondent freely admits that he intended his act as well as its consequences. Further, respondent admits that he knew that the transaction was "criminal" and "illegal." It is quite clear that respondent's conduct is conduct involving moral turpitude. Most jurisdictions have found similar attorney misconduct to involve moral turpitude.[8]

6. We are not persuaded by respondent's claim that his initial refusal to answer the FBI's questions constituted the assertion of a constitutional privilege—the Fifth Amendment. Respondent did *not* assert any constitutional privilege. He freely talked to the FBI about *his* participation in the crime. It is to *his* conduct that the Fifth Amendment applies; not to another's conduct.

7. Although there is, in the broadest sense, dishonesty involved in every crime, we do *not* (nor did the Board) find that respondent's conduct involved dishonesty, fraud, deceit, or misrepresentation. To charge respondent with a violation of this rule under the facts presented in this case would be to make this rule too broad and all encompassing. The rule should be construed in its normal sense and "dishonesty" should not be taken out of context. Rather, it should be considered as it is commonly associated with those violations involving theft, misappropriation, etc. *See, e.g., Office of Disciplinary Counsel v. Lewis*, 493 Pa. 519, 426 A.2d 1138 (1981).

8. *Disciplinary Board of the Hawaii Sup. Ct. v. Bergan*, 60 Hawaii 546, 592 P.2d 814 (1979), found misconduct involving, among other things, moral turpitude for the possession with intent to distribute 385 grams of cocaine in violation of 21 U.S.C. § 841(a). *In re Cohen*, 113

Respondent's involvement in a criminal act also adversely reflects on his ability to practice law. DR 1–102(A)(6). By his actions, respondent knowingly and intentionally shirked his responsibility as an officer of the court and exemplified disrespect for the laws which govern our society. Respondent asserts that his conduct does not impinge on his ability to practice law because his actions "did not involve or arise from his practice of law." Respondent's Brief at 34. We will not accept this distortion of DR 1–102(A)(6). The language of Pa.R.D.E. 203(a) clearly states to the contrary: violation of the disciplinary rules are misconduct and "shall be grounds for discipline, *whether or not the act or omission occurred in the course of an attorney-client relationship.*" (Emphasis supplied.) As we stated in *Office of Disciplinary Counsel v. Grigsby*, 493 Pa. 194, 425 A.2d 730 (1981), "... we cannot distinguish between dishonesty involving client matters and dishonesty in private matters: the seriousness of respondent's misconduct is not lessened by the fact that the victims of his fraud were not his clients." *Id.*, 493 Pa. at 200, 425 A.2d at 733.

■ To reach our determination that disbarment is warranted, we have examined "... the underlying facts involved in the criminal charge [and weighed] the impact of the conviction upon the measure of discipline." *Troback, supra*, 383 A.2d at 953. It is for this reason that we cannot

Cal.Rptr. 485, 521 P.2d 477 (1974), found conduct involving moral turpitude when respondent assisted a friend in the transfer of approximately 42 kilos of marijuana for "adventure." *State of Oklahoma Bar Ass'n v. Denton*, 598 P.2d 663 (Okla.1979), found conduct involving moral turpitude for the possession of marijuana. *In re Kreamer*, 121 Cal.Rptr. 600, 535 P.2d 728 (1975), found conduct involving moral turpitude for the possession and possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841 and 846. *State ex rel. Nebraska State Bar Ass'n v. Matt*, 213 Neb. 123, 327 N.W.2d 622 (1982), found conduct involving moral turpitude when an attorney facilitated the sale of cocaine between two of his acquaintances because of friendship. "... [A]iding and abetting criminal dealings in controlled substances, whatever the motivation of an attorney may be, constitutes conduct involving moral turpitude and warrants disciplinary action." *Matt, supra*, 327 N.W.2d at 624.

agree with the recommendation of the Disciplinary Board of a two year suspension. Facilitating the sale and purchase of cocaine, alone, warrants disbarment. This case, however, presents two aggravating circumstances: (1) respondent's knowledge and acquiescence in the one-half ounce of cocaine to be sold on the streets; and (2) respondent's refusal to tell the authorities the identity of the ultimate purchaser of the cocaine. In *In re Gorman*, 269 Ind. 236, 379 N.E.2d 970 (1978), respondent was convicted of possession with intent to distribute, distribution and conspiracy to distribute one gram of cocaine and was disbarred. As that court said:

> These are not the acts of an experimenting youth. Respondent actively engaged himself in the introduction of a controlled substance into a market place that, unfortunately, is too often occupied by children and adolescents. He *intentionally* set in motion, without any apparent regard for the consequences, factors which could have serious impact on other societal members. By our society, through the enactment of laws, the use, possession and sale of cocaine have been deemed unwanted and illegal acts. By his conduct, the Respondent has attempted to place himself above the law and superior to societal judgments. These acts, being committed by an attorney, are evidence of a *baseness, vileness,* and *depravity* in the social and private duties which an attorney owes to his fellowman.

*Id.* 379 N.E.2d at 971–72 (emphasis supplied).

Many different pressures come to bear on us during our daily lives, and each individual reacts differently. This Court is not unsympathetic with these stresses or the toll they may take. There are many socially acceptable means of attempting to deal with such pressures and this Court encourages their use. They are, among others, Alcoholics Anonymous, individual psychotherapy, group therapy and reliance upon family and friends for additional support. Respondent chose *none* of these and, instead, intentionally

chose the "excitement", the "intrigue" and the "challenge" of criminal activity. Respondent's conduct was despicable.

The Code of Professional Responsibility embodies the standards for attorneys practicing law in this Commonwealth so that the public is protected and the integrity of the bar preserved. Respondent has flaunted those standards and violated the Code of Professional Responsibility. There is no excuse, justification or mitigation that can overcome the seriousness of the crime committed by respondent.

It is therefore ordered that on this day respondent is disbarred. It is further ordered that respondent reimburse the costs of this proceeding pursuant to Pa.R.D.E. 208(g).

Mr. Justice Zappala filed a dissenting opinion in which Mr. Justice Flaherty joined.

ZAPPALA, Justice, dissenting.

I dissent. It is apparent to me that the majority, by its actions today, is adopting a per se rule of disbarment based not upon an attorney's fitness to practice law, but more upon those acts which one might personally abhor. I must question the propriety of a procedure whereby we focus solely upon the act and in so doing disregard the insight and recommendations of that body to which we have assigned the duty of investigating and recommending the proper action in a given disciplinary situation.

After a thorough review by the hearing committee and the Disciplinary Board, it was recommended that the Respondent be disciplined by a two-year suspension. The majority, however, chooses to disregard the findings and recommendations of that board and reaches a result contrary to the Board's without offering any explanation as to why that body's recommendation is inadequate. While I certainly do not challenge this Court's right to proceed de novo in a disciplinary proceeding, which by law we are mandated to do, I do question the propriety of reaching a contrary result where there is no indication by this Court as

to the reasoning for the deviation from findings enunciated by the Board. Where we fail to express some reason for differing from the findings and recommendations of the Board, I question the continued vitality of the Board since we have effectively ignored all its work and have given no weight whatsoever to its recommendations. This is not only illogical, but flies in the face of the powers we have given to that body. *See,* Pa.R.D.E. 205, 208. This Court has reposed in the Board an area of expertise not unlike that of an administrative board. Its recommendations ostensibly are seasoned with the insights and experience gleaned from many prior disciplinary actions. In spite of that expertise, this Court, in arbitrarily choosing to deviate from the Board's recommendations without setting forth its underlying logic, does a disservice to the members of our bar who look to this Court for some stable measure of guidance in conforming their conduct to the rules we have promulgated. Discipline arbitrarily imposed is not discipline at all and indeed fails not only its definition, but its very purpose as well.

In my review of this case, I have focused on the distinction between disbarment and suspension set forth in *Office of Disciplinary Counsel v. John J. Keller,* 509 Pa. 573, 506 A.2d 872, (1986) and have come to the conclusion that disbarment is not warranted in the instant case. Instead, I would suspend Respondent for the period recommended by the Board and allow him to resume his practice upon a demonstration by him of his fitness to continue the practice. I would do so for several reasons, the primary of which is that I choose to look at this case in the "totality of the circumstances" manner that this Court so readily applies to other areas of the law. In so doing, I note that the Respondent's actions neither concerned the use of his position as an attorney, nor were motivated by the chance of profiting upon the situation. Indeed, given the Respondent's sorry state at the time the incidents took place, it is remarkable that he did not seize upon this opportunity and

parlay his connections and the availability of drugs into a profitable endeavor. These facts, combined with the exemplary work the Respondent had done in the past to help those people who could not afford legal help, indicates to me that this Respondent suffered a momentary lapse of character and does not possess an *inherent* flaw in his character which, if present, would make me prone to concur with my brethren and disbar this attorney. When this Court, as supervisor of the Bar of this Commonwealth, fails to perceive the difference between a momentary lapse of character, and a flaw which will affect not only the lawyer but the general public through its contact with him, we do a disservice to those we are duty bound to supervise and protect. While I certainly do not wish to minimize the seriousness of the criminal acts in which the Respondent was involved, I do not separate them from the character of the Respondent as it is reported in the record. Where there is a past history of competent and beneficial service to the profession, and the misconduct does not evidence a misuse of his profession or his clients, nor show an inherent flaw in his character, it should be this Court's obligation to pursue rehabilitation for that attorney. In suspending the Respondent, we show the Respondent that we do not look with favor upon his indiscretion, but at the same time do not ignore his prior achievements. By allowing him to continue to remain in the fraternity of lawyers during the period of his suspension, we show that attorney that we have faith in his rehabilitation, and that we have not abandoned him because of his indiscretion. This should provide incentive for that attorney to reflect upon his deeds during the course of his suspension knowing that those who have placed their faith in his recovery will be watching his progress, ever vigilant of a breach of that trust.

For the reasons above stated, I would sustain the findings and recommendations of the Board.

FLAHERTY, J., joins in this dissenting opinion.