**In re Anonymous No. 124 D.B. 89**

Disciplinary Board Docket No. 124 D.B. 89.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

FRIEDMAN, *Member,* January 15, 1991—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, The Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## HISTORY OF PROCEEDINGS

On November 13, 1989 the Office of Disciplinary Counsel filed a petition for discipline against respondent. On December 5, 1989, respondent's counsel advised the Secretary of the Disciplinary Board that respondent was not filing an answer to the petition for discipline but was requesting that the charges be deemed at issue.

The matter was referred to Hearing Committee [ ] which was chaired by [ ]. A hearing was held on March 28, 1990. The hearing committee filed its report on August 21, 1990, and recommended that respondent receive a private reprimand.

On September 12, 1990, petitioner filed a brief on exceptions to the hearing committee report. On October 1, 1990, respondent filed his brief opposing exceptions.

Pursuant to petitioner's request, oral argument was heard before three members of the Disciplinary Board on October 30, 1990. The matter was adjudicated by the Disciplinary Board on November 2, 1990.

## FINDINGS OF FACT

We adopt the findings of fact which were proposed by the hearing committee:

(1) On November 21, 1985, respondent was contacted by telephone by an individual inquiring into the possibility of acquiring or obtaining cocaine from respondent.

(2) Cocaine is a Schedule II controlled substance, as defined in the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act.

(3) At that time, respondent agreed to meet with the individual referred to in paragraph 1, above.

(4) On or about that same day, respondent met with that individual at [A] Restaurant at the [B] Mall, and was introduced to another individual identified to him only as "[C]."

(a) At that time, respondent stated that he would procure cocaine through another individual for "[C]."

(b) Respondent and "[C]," who was acting as an agent for the [ ] Police Department, agreed that they would be back in touch with each other.

(5) On November 30, 1985, "[C]" contacted respondent and arranged to meet with him at the [B] Mall later that same day, in order for respondent to deliver one-eighth ounce of cocaine to [C], in exchange for which she would give respondent $280, which respondent said was for delivery to the person from whom respondent was obtaining the cocaine.

(6) Shortly before the purchase was to occur, respondent changed the location of the meeting to a parking lot near [D] Restaurant in [E] Plaza.

(7) On that same day, in the parking lot near [D] Restaurant, respondent delivered one-eighth ounce

of cocaine to "[C]," in exchange for delivery to him by her of $280 in cash.

(8) Respondent was not a person registered pursuant to the Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act or licensed by any state board to sell or deliver a Schedule II controlled substance.

The respondent was not at the time of the 1985 incident, has not been since that time and is not now a drug dealer or drug merchant. The person who contacted respondent was a police informant. The police set up the initial contact based upon information received from a single source, which later proved to be unreliable, that respondent could procure cocaine. Prior to the 1985 incident, respondent had never procured cocaine for anyone. Respondent initially resisted procuring the cocaine, but when the informant was persistent in calling respondent and insisting on his help in procuring the cocaine, respondent acquiesced.

Respondent acted as a "go-between" in the cocaine transaction; he did not make any money or other profit from the transaction. Prior to 1984, respondent lived a normal, respectable lifestyle. Respondent had never engaged in the use of any illegal drugs. While he drank socially, he did not drink to excess. Respondent was a conscientious and thorough practitioner who worked hard at his legal practice.

Respondent was married twice; the first marriage broke up in 1974, and the second in about 1982, although the second divorce was not final until sometime later. With the break-up of respondent's second marriage in 1982 he began to experience a number of personal problems that gradually led respondent to live an out-of-character lifestyle for a

short period of time from late 1984 into 1985. Respondent was lonely, depressed, and unhappy with his life, and described himself as being "vulnerable" during this period. Rather than going home to an empty house after work, respondent began going to bars to avoid being alone.

The frequency with which respondent went to bars after work gradually increased from once or twice a week in 1982 to almost every night by late 1984. Consequently, by the later part of 1984, respondent was drinking to excess. As a result of this nightly frequenting of bars and overindulging, respondent began associating with the "wrong crowd" of people, who eventually introduced him to cocaine. Thereafter, and for a short period of time, respondent used cocaine on an occasional basis. Respondent's lifestyle during this period was exacerbated by a woman with whom respondent developed a relationship, and who herself had a serious drinking problem.

No client or legal matter was ever adversely affected by any aspect of respondent's indulgent lifestyle in 1984-85.

By about mid-1985, respondent, through self-assessment and reflection, began to realize the inappropriateness of his lifestyle and began to pull himself out of the emotional abyss into which he had fallen. His struggle out of his emotional abyss was aided by [F], his current fiance, whom respondent began dating casually in about September 1985. By November 1985, respondent was dating Ms. [F] exclusively, and had made major strides to extricate himself from the lifestyle into which he had fallen, although reversion to his previous lifestyle was still somewhat of a struggle at that time.

Respondent's improper drug use had ceased some months previous to this time, and respondent's drinking had been substantially curtailed. Respondent was again working much longer hours at his law practice.

It was during this transition period that the police informant began persistently calling respondent, asking him to procure cocaine for her. Respondent was initially resistant to procuring cocaine for the informant, however, the informant was persistent in calling respondent. Eventually the respondent was worn down, and he agreed to act as a go-between as a "favor" to a friend, and to obtain a small amount of cocaine for her.

Respondent never before engaged in any such conduct, and he has not since.

Respondent testified to the wrongfulness of his conduct, and its stupidity. He indicated sincere remorse.

The police officers who set up the transaction in question realized that respondent was not a drug dealer or merchant, and thus elicited respondent's cooperation rather than arrest him. Although he was at first hesitant to cooperate with the police because he was "scared" of the inherent dangers in such an involvement, he naturally agreed to cooperate rather than be arrested. The [ ] County District Attorney's office knew of, and specifically consented to, this agreement.

Respondent did not simply go through the mechanics of cooperation, but rather he took the initiative in trying to help the police develop cases against drug dealers. As a direct result of that cooperation, the police were able to develop cases

against drug dealers resulting in several arrests and convictions. One such arrest and conviction in-volved [G].

Following [G's] arrest in October 1987, respondent was informed by the police that he had met his obligation, that he had a "clean slate," and that his cooperation with police was no longer required. By the Fall of 1987, respondent had lived a "clean" lifestyle for almost two years. Specifically, aside from his cooperation with the police, respondent had no connection with illegal drugs for nearly two years. Since late 1985, respondent had not been engaging in any excessive use of alcohol. Rather, respondent had been working long, hard hours in his practice of law, including evenings and weekends.

Of great importance was the fact that respondent, during this two-year period, had developed a very strong anti-drug sentiment, and had become philo-sophically and morally committed to the fight against drugs. After being released from any further obligation by the police following the [G] arrest and conviction, respondent, because of his philosophical and moral commitment to the fight against drugs, offered to continue to cooperate with the police in their undercover investigations of drug traffickers. The police gratefully accepted respondent's offer, and respondent has continued to the present time to cooperate with the police in their undercover drug investigations, at great personal danger to himself.

The undercover narcotics detectives have the utmost faith, confidence, and trust in respondent and respondent's continued cooperation has re-sulted in additional arrests and convictions of drug traffickers.

In November 1988, respondent testified for the prosecution in the criminal trial of [G]. Respon-

dent's testimony, which was voluntarily provided long after he had satisfied his obligation to the police, resulted in a single newspaper article about the trial that, to the extent that it focused on respondent, highlighted his cooperation with the police and told what had initially led to that cooperation. It indicated that respondent was "helping the police."

The newspaper article led to the filing of the disciplinary charges against respondent.

Respondent's lifestyle since the fall of 1987 has remained as it was for the two-year period from late 1985 to the fall of 1987, when respondent was released from any further obligation to the police. Respondent has had no improper involvement with illegal drugs since 1985. He has not engaged in any excessive use of alcohol. He has continued to work six or seven days per week, well into the evening hours. Despite the long hours that he works at his practice, respondent's income is extremely modest because of the amount of free legal advice he provides and the amount of pro bono work he performs.

Finally, in respondent's 16 years of practice:

Respondent has never received discipline for any wrongdoing in any jurisdiction in which he has been admitted.

Respondent has never had the ethical propriety of his practice of law questioned by any court, judge, or agency.

Respondent has never had his honesty or integrity questioned by any person, court, or agency.

Respondent has never been sued for malpractice.

Respondent has never been arrested, prosecuted or convicted for any criminal matter.

Respondent has never been disciplined in college, law school, or at any other time, or in any other context, for any improper conduct.

Respondent is known to provide good, competent, and thorough legal services, and to be very attentive to his clients' needs.

Respondent has also been involved in community projects. He was instrumental in the formation of the [   ], a charitable organization in existence since about 1986, which provides free toys and gifts to economically disadvantaged children on Christmas Eve each year. He provided on a pro bono basis all of the legal work to incorporate the organization, and he has been actively involved in the organization's activities, procuring, gift-wrapping and delivering toys and gifts to disadvantaged children.

## CONCLUSIONS OF LAW

Respondent, by virtue of his aforementioned misconduct, has violated the following Rules of Professional Responsibility:

(A) Disciplinary Rule 1-102(A)(6)

(B) Disciplinary Rule 1-102(A)(3)

## DISCUSSION

The facts in this case are not in dispute. Respondent delivered one-eighth ounce of cocaine to a police informant on November 30, 1985 for $280. Respondent subsequently agreed with law enforcement personnel to cooperate in further drug investigations. As a result, the police and the [   ] County District Attorney's Office agreed that no criminal charges would be brought against respondent.

The Commonwealth's agreement not to charge respondent is not determinative in a disciplinary action. Rather, the board must consider the underlying circumstances of respondent's conduct. If the respondent's conduct violates the Code of Professional Responsibility then appropriate discipline must be imposed. Discipline is of course imposed to protect the public from unfit practitioners and to preserve the integrity of the bar. *Office of Disciplinary Counsel v. Stern,* 515 Pa. 68, 526 A.2d 1180 (1987).

We have no difficulty finding that the respondent's conduct violated D.R. 1-102(A)(6) and 1-102(A)(3). We find no violation of D.R. 1-102(A)(4).

The crucial question to be determined is the appropriate degree of discipline to be imposed. Although the board gives great deference to the excellent report prepared by the hearing committee, the board is of the opinion that a private reprimand is inappropriate and that public discipline must be imposed.

The petitioner recommends that respondent be suspended for a period of three years. It bases its position on the Supreme Court's decision in *Office of Disciplinary Counsel v. Simon,* 510 Pa. 312, 507 A.2d 1215 (1986). Simon is distinguishable on its facts. Simon was actively involved in the sale and purchase of four ounces of cocaine. Simon in fact obtained the purchaser for the seller and arranged the transaction. At the time of the transaction one-half ounce of the cocaine was taken by the seller with respondent's knowledge to be sold on the streets. Simon was subsequently indicted and convicted of conspiracy (21 U.S.C. §846) and distribution of a Schedule II controlled substance. (21 U.S.C. §841 (a)(1).) He was sentenced by the U.S.

District Court for the Middle District of Pennsylvania to a three-month period of incarceration, two years probation and 200 hours of community service work. The board recommended that Simon be suspended for a two-year period. In rejecting the board's recommendation and disbarring Simon, the Supreme Court noted the presence of two aggravating factors:

"(1) Respondent's knowledge and acquiescence in the one-half ounce of cocaine to be sold on the street; and

"(2) Respondent's refusal to tell the authorities the identity of the ultimate purchaser of the cocaine." (507 A.2d at 1220).

As the hearing committee noted, *Simon* is distinguishable. The amount of drugs delivered and the circumstances of the delivery are substantially different.[1] Unlike *Simon,* respondent was never charged with any criminal offense. His personal circumstances were also substantially different. Furthermore, respondent's misconduct, unlike Simon's, did not relate to his practice of law. Most importantly, neither of the aggravating factors enunciated by the Supreme Court in *Simon* are present in the case at bar. We therefore believe that a different degree of discipline is appropriate.

The board agrees with the hearing committee that the delivery of a controlled substance such as cocaine cannot be tolerated. Such conduct warrants the imposition of public discipline. In determining the extent of such discipline the board is obligated to take into consideration any aggravating or mitigating

---

1. We note that respondent suggests that he may have raised an entrapment defense had he in fact been charged. We express no opinion on the validity or success of such a defense.

factors. The respondent admittedly delivered a relatively small quantity of a controlled substance. He was, however, neither charged nor convicted of any criminal offense. The misconduct occurred in November 1985.[2] The respondent was subsequently contacted by law enforcement officials and he agreed to cooperate in drug investigations. The police and the District Attorney's Office agreed not to prosecute respondent in exchange for his cooperation.

The respondent fulfilled his obligation to the Commonwealth. In fact, the police officers testified that respondent went beyond the terms of his original agreement and in effect became a volunteer agent. Respondent, in the words of the testifying officers, put his life on the line to uncover illegal drug activities when he was not required to do so pursuant to the terms of his original agreement. His cooperation has resulted in several arrests and convictions.

The board does not suggest that cooperation and becoming a volunteer agent for law enforcement officials is in and of itself sufficient to avoid suspension and/or disbarment. *In re Anonymous No. 16 D.B. 82,* 33 D.&C. 3d 563 (1984). Rather, the board takes into account multiple other mitigating factors. We take into account respondent's unblemished record and the personal problems which he was having at the time of the misconduct. The board also takes into consideration that the misconduct was not committed in respondent's capacity as an attorney and was not related to his practice of law. We furthermore give consideration to respondent's ef-

---

2. Petitioner instituted disciplinary proceedings after reading of respondent's trial testimony as a cooperating witness in a newspaper article in November 1988.

forts to rehabilitate his life since the misconduct and his present good standing in the community in general and in the legal community in particular.

The respondent has recognized the impropriety of his act and has made substantial efforts to rehabilitate himself. He has acted admirably in his law enforcement efforts. He is respected in the legal community and there is no evidence to suggest that he is currently unfit to practice law. Taking into consideration all factors we believe that this "single instance of misbehavior," although serious, does not warrant suspension. *In re Anonymous No. 5 D.B. 83,* 35 D.&C. 3d 160, 167 (1984). We therefore recommend that respondent be censured by the Supreme Court.

## RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that respondent be censured by the Supreme Court of Pennsylvania. It is further recommended that respondent be ordered to pay the costs of investigating and prosecuting this matter.

Messrs. Tumolo and Gilardi did not participate in the adjudication of this proceeding.

## ORDER

And now, May 21, 1991, upon consideration of the report and recommendations of the Disciplinary Board dated January 15, 1991, it is hereby ordered that [respondent] be subjected to public censure by the Supreme Court at the session of court commencing September 23, 1991, in Pittsburgh. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.