## In re Anonymous No. 76 D.B. 91

Disciplinary Docket no. 76 D.B. 91.

ECKELL, *Vice-Chairman,* November 6, 1992—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania ("board") herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

### I. HISTORY OF PROCEEDINGS

The Office of Disciplinary Counsel filed a petition for discipline against respondent on June 10, 1991. The petition contained allegations of professional misconduct based upon respondent's answers to questions

submitted to the Pennsylvania Board of Law Examiners in conjunction for application to the Bar of this Commonwealth.

Respondent filed an answer on July 8, 1991, and admitted that she had supplied the Pennsylvania Board of Law Examiners with the responses outlined in the petition for discipline, but denied that she was guilty of any misconduct.

The matter was referred to Hearing Committee [    ], which was chaired by [    ], Esquire, and included [    ], Esquire, and [    ], Esquire. The committee held a hearing on the matter on November 12, 1991. On May 11, 1992, the Hearing Committee filed its report and recommended that respondent be suspended from the practice of law for a period of three years.

On May 22, 1992, respondent filed a brief on exceptions to the findings of the Hearing Committee and requested oral argument.

Petitioner filed a brief in opposition to respondent's exceptions on June 10, 1992.

Oral argument was heard before a three-member panel of the Disciplinary Board on July 22, 1992.

The matter was adjudicated at the July 24, 1992 meeting of the Disciplinary Board of the Supreme Court of Pennsylvania.

## II. FINDINGS OF FACT

We make the following findings of fact, based upon stipulations entered into by the parties and testimonial evidence offered by respondent:

(1) Petitioner, whose principal office is now located at Suite 400, Union Trust Building, 501 Grant Street, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforce-

ment (hereafter Pa.R.D.E.), with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent, [    ], was born in 1953 and admitted to the Pennsylvania Bar in 1988. She currently maintains an office located at [    ]. (P-3, Paragraph 2; P-4, Paragraph 2; N.T. 74.)

(3) Respondent is the product of an impoverished, single-parent, housing project household. She was raised in [    ]. (N.T. 74, 75.)

(4) Respondent graduated first in her high school class and was the first black female in her school to obtain a 96 percent average. (N.T. 75-77.)

(5) Following high school, respondent became pregnant and moved in with her child's father. (N.T. 77.)

(6) Respondent subsequently returned to school and graduated from the University of [    ] in 1976 with a degree in sociology. (N.T. 79, 80.)

(7) After college graduation, respondent was employed by the [    ] Bank, first in [    ] and then in [    ], where she became the first black office manager. (N.T. 81.)

(8) Respondent later worked for two other employers and married [A], with whom she had an autistic child with hydrocephalus, in 1982. (N.T. 81-83.)

(9) In the early 1980s, respondent's husband became abusive and developed an addiction to cocaine and heroin, which ultimately resulted in his death in 1985. (N.T. 85, 89.)

(10) In the late 1970s and early 1980s respondent, who had been through bankruptcy proceedings, expe-

rienced difficulty securing a job because of her poor credit rating. Her husband, who worked in the credit industry, recommended that she apply for employment under a false social security number. After securing employment in this manner, respondent corrected the number with her employer. At the time these events occurred, respondent was a single mother, and did not want to go on welfare. (N.T. 86-88.)

(11) Respondent applied for credit cards under the fictitious social security number with the hope of establishing a new credit history. She paid all charges incurred from the use of the credit cards. (N.T. 88, 89.)

(12) In 1982 or 1983, respondent separated from her husband and denied his pleas for reconciliation. In retribution, her husband contacted respondent's employer and the credit card companies, informing them of her use of a fraudulent social security number. (N.T. 89, 90.)

(13) In August, 1984, respondent was indicted in the United States District Court for the Northern District of [    ], [    ] Division. The matter was subsequently transferred to the Southern District of [    ]. On August 30, 1984, respondent pled guilty to two of the four counts in the indictment charging her with deception about her credit history and use of a false social security number.

(14) In October, 1984, the court suspended the imposition of sentence, placed respondent on concurrent periods of three years' probation, and ordered her to make restitution in the amount of $1,242.32. She has successfully completed the terms of her probation.

(15) In September, 1984, respondent entered the University of [    ], [    ] School of Law, where she became the first black student to win the moot court competition

and served as president of the Black Law Student Association (N.T. 101, 102.) She also attended [    ] University in [    ] and received a certificate for her work in the area of intellectual property. (N.T. 102, 103.)

(16) As a second year law student, respondent worked in a clinical program, which required her to apply for law student admission to the [B] Bar. (N.T. 104-106.) Respondent indicated on her application that she had been through a bankruptcy and been convicted of a crime. Her application was denied on "moral grounds." (N.T. 107.)

(17) In 1988, respondent filed an application for admission to the Pennsylvania Bar. On the application, respondent admitted she had experienced a bankruptcy but denied having ever been arrested or convicted of a crime.

(18) Respondent's explanation for the discrepancy in her revelations to [B] and Pennsylvania Bar officials was that she believed her record would be expunged under the Youthful Offender's Act or the Young Adult Offender's Act after her successful completion of probation. Because of this erroneous belief, according to respondent, she had a record in [B] while still on probation but not when she applied to sit for the Pennsylvania Bar. (N.T. 107, 108.)

(19) [C], respondent's probation officer, contests this explanation. [C] submitted a letter to the Office of Disciplinary Counsel in which he stated he had advised respondent that she did not qualify for either the Youthful Offender's Act or the Young Adult Offender's Act because of her age at the time the offenses were committed. (Ex. P-11.)

(20) Following her 1988 admission to the Pennsylvania Bar, respondent was employed by the [    ] District Attorney's Office, where she remained until she

was terminated in February, 1990 because of her guilty plea. (N.T. 114-116.)

(21) Since leaving the Office of the District Attorney, respondent has practiced criminal defense work, landlord/tenant law, and handled domestic abuse matters. (N.T. 118, 119.)

(22) Until the instant proceedings, respondent had never been the subject of a disciplinary complaint. (N.T. 124.)

(23) Numerous members of the legal community testified before the Hearing Committee that respondent had an excellent reputation for truthfulness, and possessed very strong legal skills. (N.T. 12-17, 26-27, 32-33, 35-37, 39-40, 43-45, 47, 49-50.)

## III. CONCLUSIONS OF LAW

Respondent's representation to the Pennsylvania Board of Law Examiners that she had never been arrested or prosecuted for any crime was a violation of D.R. 1-101(A) and R.P.C. 8.1(a), since respondent had in fact pleaded guilty to using a false social security number for the purpose of obtaining credit cards.

## IV. DISCUSSION

The issue before this board is the appropriate measure of discipline for a lawyer who has made a materially false statement in connection with her application for admission to the Pennsylvania Bar, and also provided evidence of her unique contribution to the practice of law.

Respondent is subject to discipline because she indicated to the Board of Law Examiners that she had never been arrested or prosecuted for any crime, when in fact she pled guilty in 1984 to two counts of a four

count indictment charging her with deceptive use of a false social security number for the purpose of obtaining credit cards. Disciplinary Board Rule 1-101(A) and Rule of Professional Conduct 8.1(a) specifies that:

"A lawyer is subject to discipline if the lawyer has made a materially false statement in, or if the lawyer has deliberately failed to disclose a material fact requested in connection with the lawyer's application for admission to the bar ... ."

Respondent has admitted that she furnished the Board of Law Examiners with a negative response to the query about any arrests or convictions. It is, therefore, obvious that respondent's conduct is a violation of R.P.C. 8.1(a). Having so determined it is unnecessary to address any other violations arising solely from this one instance of misconduct.

We now examine the existence of mitigating circumstances. It has been respondent's position throughout these proceedings that she did not supply the Board of Law Examiners with false information concerning her past, but rather believed that her criminal record would be expunged upon completion of her probation, pursuant to the Young Adult Offender's Act. Respondent contends that she denied having a criminal record in 1988 but admitted in 1984 that she had been arrested, when submitting a law student registration in [B], because she was still on probation in 1984, and therefore her record could not yet be expunged.

Although he did not testify before the Hearing Committee, respondent's former probation officer, [C] submitted a letter to Disciplinary Counsel in which he contradicts this supposition, and claims that he told respondent that she was too old at the time of her offenses to be part of the Young Offender's program,

in which the record is expunged after successful completion of probation. (Ex. P-11.)

The Hearing Committee concluded that respondent was not credible on the issue of whether she honestly believed that she qualified for the Young Offender's program, and that her record would be expunged upon completion of probation. Although we are not bound by the findings of the Hearing Committee, we agree that respondent's explanation is not plausible, since she was over 26 years of age at the time the offenses occurred.

Respondent is not the stereotypical practitioner in this or any other jurisdiction. She is the product of a single-parent home in a crime-ridden section of [    ], where virtually all of her peers have become drug-addicted or welfare-dependent, or died. (N.T. 74, 75, 77.) Respondent was a teenage mother who subsequently earned a degree in sociology from the University of [    ], (N.T. 77, 79, 80.) She is also the mother of an autistic child with hydrocephalus. (N.T. 83.) Additionally, respondent is the widow of an abusive, drug-addicted man, who encouraged her to commit the credit card fraud which sparked the chain of events leading to her appearance before this board. (N.T. 85-88.) Respondent was the first black manager of the [    ] Bank in [    ]. (N.T. 81.)

After working as an assistant district attorney in [    ] respondent embarked on private practice emphasizing criminal defense, landlord/tenant matters, and domestic abuse cases. (N.T. 119.) Respondent's disciplinary record was unblemished before these proceedings. (N.T. 124.) Additionally, respondent enjoys an admirable reputation as an accomplished practitioner among her peers during her tenure as an assistant district attorney in [    ].

Respondent brings a unique perspective to the practice of law, based on her past history as an impoverished minority, abused wife, and mother of a handicapped child. As respondent herself pointed out, she is one of a handful of female attorneys whose practice emphasizes criminal defense work.

Although respondent's unusual personal circumstances in no way excuse her unprofessional transgression, we believe there are sufficient mitigating circumstances to warrant her continuation in practice. Every disciplinary matter must be adjudicated in a manner which will protect the interests of the public and uphold the integrity of the bar. See *Office of Disciplinary Counsel v. Stern*, 515 Pa. 68, 526 A.2d 1180 (1987).

It is our belief that the interests of both the public and the bar are best served by disciplining respondent in a way which will cause her to recognize the severity of her misconduct yet also allow her to continue filling a sorely needed niche within the legal community. A public censure would achieve both of these objectives.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that respondent, [    ], be subjected to a public censure. It is further recommended that the court direct that respondent pay all of the necessary expenses incurred in the investigation and processing of this matter pursuant to Rule 208(g), Pa.R.D.E.

Messrs. Paris and Witherel did not participate in the adjudication.

## ORDER

And now, January 21, 1994, upon consideration of the report and recommendations of the Disciplinary

394

Board dated November 6, 1992, it is hereby ordered that [respondent] be and she is suspended from the Bar of this Commonwealth for a period of two years and she shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice Papadakos files a dissent.

Mr. Justice Castille did not participate in the consideration or decision of this matter.

### DISSENT

PAPADAKOS, *J.*, January 21, 1994—This court proposes to sanction this errant attorney by suspending her for two years. I dissent vigorously and call for a rule to show cause why she should not be disbarred.

This respondent has chosen a course of lying and deceit to claw her way out of poverty and the plight of the disadvantaged. She appears to be exceedingly bright but has unfortunately used her mental abilities in criminal ways to advance her career. When faced with bankruptcy and the loss of credit, she chose to falsify applications to obtain a new identity for a new social security card and new credit cards. In August, 1984, when she was 30 years of age, she pled guilty to two counts of deception as to her credit history on her application for credit cards from a department store and bank in the state of [    ]. She also used the false social security card. She was convicted and sentenced to concurrent terms of probation for three years.

In September, 1984, she entered the University of [    ], [    ] School of Law. She gained admission by falsifying her application for admission in lying about her federal convictions. In her second year at school,

she applied to participate in a clinical program which required admission to [B] Bar. The application was denied because she had revealed her criminal record and she was deemed morally unfit.

She also falsified her application for employment to obtain a job with the [   ] company. In 1988, she applied for admission to practice law in Pennsylvania. Question 14(b) of the application asked: "Have you ever been arrested or prosecuted for any crime (other than a summary motor vehicle violation)?" She answered, "No." In subsequent letters to the Board of Law Examiners she also did not reveal her criminal record. Her failure to answer completely and properly was rewarded with admission to our Bar.

When these falsehoods were brought to light in February, 1990, proceedings were instituted—in her case in August of that year. The record indicates that while she regrets her conduct, she does not admit to intentional conduct. Rather, she blames others for giving her misleading information. Her explanation is that she was told repeatedly that conviction did not arise until a sentence was imposed and that she had been told incorrectly that she fell under the Youthful Offender's Act which would expunge her record after serving probation. As bright and knowledgeable as she is, it defies logic to accept that she relied on this information. Her criminal and other errant conduct was committed with full awareness and appreciation of its wrongness.

As to her personal background, which has been put at issue in this case, she was the product of an admittedly horrible past. Raised in [   ] project homes by a single parent, she herself became an unwed teenage mother. She subsequently graduated from the University of [   ], worked in a bank, and married a drug addict who abused her. She also had another child who was

autistic with hydrocephalus. Upon admission to Pennsylvania, she worked for the district attorney in [    ] until she was terminated in February, 1990, when it was learned that she had a criminal record. She has been a criminal defense attorney since that time. She has worked with indigent clients—has no other record of discipline, and has never been sued in malpractice. Her academic record is excellent.

I entertain no doubts that [respondent] is a remarkable woman who, under other circumstances, would be an asset to the legal profession. Her personal background, nevertheless, is not the issue here. The sole question for this court concerns her misconduct.

In contemplating punishment, the Disciplinary Board concluded that a public censure would suffice because: "Respondent brings a unique perspective to the practice of law, based on her past history as an impoverished minority, abused wife, and mother of a handicapped child. As respondent herself pointed out, she is one of a handful of female attorneys whose practice emphasizes criminal defense work."

Perhaps such views speak more to the issue of standards being employed currently by the board. If that is true, then more is the pity for the public and more is the danger to the legal profession.

We are governed by laws, and I know of no precedent that would direct us to excuse acts of moral turpitude on these bases. On the contrary, we are directed to withdraw our endorsement of an attorney through admission whenever that attorney is no longer worthy of confidence because of such conduct. *Office of Disciplinary Counsel v. Simon,* 510 Pa. 312, 507 A.2d 1215 (1986), (defining moral turpitude as "anything done knowingly, contrary to justice, honesty, principle, or good morals"). "Furthermore, the race of an attorney

can have absolutely no bearing on the appropriate punishment for professional misconduct." *Office of Disciplinary Counsel v. Grigsby,* 493 Pa. 194, 201, 425 A.2d 730, 733 (1981), (Grigsby, an African-American, was disbarred for giving false information on an application for a driver's license).

Here, the fact is that one state [B], would not admit her because of her conviction. Had we had knowledge of her record, she might not have been allowed to practice in Pennsylvania in the first place, in the absence of explanation, and I am convinced that we should return to that starting point, even considering the Hearing Committee's recommendation of a suspension for three years.

The method of accomplishing that purpose is to issue a rule to show cause in order to have [respondent] explain to this court the reasons for her conduct and why she should be allowed to practice here. The Commonwealth should be made whole by reverting our consideration to the point of admission. I view fraud in the admission procedure as equal to fraud on the court in that all subsequent activities must be tainted and invalid.