555 A.2d 883

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

v.

**Robert B. SURRICK, Respondent.**

Supreme Court of Pennsylvania.

Argued Oct. 25, 1988.

Decided March 7, 1989.*

* This decision was considered and rendered prior to March 7, 1989.

Thomas B. Rutter, Philadelphia, for respondent.

Alan J. Davis, Asst. Disciplinary Counsel, Philadelphia, for Disciplinary Bd.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

In this appeal we are asked to review an order of the Disciplinary Board of this Court directing that attorney Robert B. Surrick be subjected to a private reprimand. The pertinent facts are as follows.

In 1980, then Mr. Chief Justice Henry X. O'Brien directed the Judicial Inquiry and Review Board (hereinafter JIRB) to conduct an investigation upon charges that Mr. Justice Larsen had engaged in certain improprieties. Hearings were held over a two year period, after which the members of the JIRB were in disagreement as to whether Mr. Justice Larsen should be removed from judicial office, but a majority voted to dismiss all charges. Immediately thereafter, Surrick, one of the members of the JIRB, filed a petition with this Court seeking leave to file a sealed document, removal of the matter involved from the JIRB, and requesting that plenary jurisdiction be accepted by this Court. This petition, designated as the "XYZ Petition" in order to preserve confidentiality of the JIRB proceedings, was dismissed by the Court. *Application of Surrick*, 504 Pa. 25, 470 A.2d 447 (1983). Mr. Justice Larsen participated in voting for its dismissal. A dissenting opinion was filed by Mr. Justice Nix (now Chief Justice), joined by Mr. Justice McDermott, criticizing Mr. Justice Larsen's participation in the vote:

At the outset of the Court's deliberation on this subject, objection was made to the participation of Mr. Justice Larsen. The basis of that objection is Article 5, Section 18(i) of the Pennsylvania Constitution which prohibits,

without qualification, a justice from participating "in any proceeding involving his suspension, removal, discipline or compulsory retirement." It was argued in support of the refusal of Mr. Justice Larsen to recuse himself that it was not apparent the matter under consideration was related to the charges currently pending before the Judicial Inquiry and Review Board against Justice Larsen. In view of all of the information that has been made public through the media and through prior applications to this Court, it is ludicrous to suggest that it was not absolutely obvious that the Petition for Removal was a request in connection with the Larsen inquiry.

504 Pa. at 31, 470 A.2d at 450.

Upon learning that Mr. Justice Larsen failed to recuse himself from voting on the "XYZ Petition," Surrick filed a complaint with the JIRB alleging judicial misconduct. In June of 1983, the JIRB, allegedly without investigating the matter, and in the presence of Surrick, voted to dismiss the complaint. Surrick then proceeded to disclose to the public the fact that the JIRB had dismissed his complaint without an investigation into the propriety of Mr. Justice Larsen's vote. This was done through letters to the presidents of various county bar associations in Pennsylvania, a letter to the legislature's Speaker of the House, and an article published by Surrick in a legal journal.

Also in June of 1983, Surrick sought leave to intervene in litigation in the United States District Court involving the issue of whether records of the earlier investigation of Mr. Justice Larsen, to wit, the investigation commenced in 1980, should be made public. See *First Amendment Coalition v. Judicial Inquiry and Review Board,* 579 F.Supp. 192 (E.D. Pa.1984), *vacated,* 784 F.2d 467 (3rd Cir.1986). Surrick submitted with his motion to intervene a memorandum, pertaining to that litigation and marked "confidential," that had been prepared for the JIRB by one of its legal counsellors. The motion to intervene was, nevertheless, denied.

Soon thereafter, in July of 1983, Mr. Justice Larsen filed with the Disciplinary Board of this Court a complaint

against Surrick. After extensive review, including a number of evidentiary hearings, the Board ordered in January of 1988 that Surrick be subjected to a private reprimand. The basis for this order was the Board's determination that DR 1–102(A)(5), which prohibits an attorney from engaging in conduct prejudicial to the administration of justice, had been violated in two respects.[1] The first of these consisted of Surrick's disclosures to the public regarding the JIRB's disposition of his complaint. The second consisted of the filing of the confidential memorandum of a JIRB legal counsellor in connection with Surrick's motion to intervene in federal litigation. The essence of both violations rests upon the Disciplinary Board's perception that confidentiality standards of the JIRB had been transgressed.

The relevant confidentiality standards are set forth in Article V, Section 18(h) of the Pennsylvania Constitution, where it is provided, "All papers filed with and proceedings before the [JIRB] shall be confidential but upon being filed by the [JIRB] in the Supreme Court, the record shall lose its confidential character." Virtually identical language is found in 42 Pa.C.S. § 3334 and in Rule 20 of the Rules of Procedure governing the JIRB. Hence, in the normal case, it is only in the event that the JIRB recommends discipline and forwards its record to this Court that confidentiality expires.

At all times pertinent to this case, Surrick was a member of the JIRB. The JIRB is not, in itself, a "court," but rather is a constitutionally independent body, judicial in character, established by the Judiciary Article of the Pennsylvania Constitution. See Pa. Const. Art. V, § 18; *First Amendment Coalition v. Judicial Inquiry and Review Board,* 501 Pa. 129, 460 A.2d 722 (1983). It is comprised of nine members, including three judges of the courts of common pleas, two judges of the Superior Court, two non-judge members of the bar, and two laymen. Pa. Const. Art. V, § 18(a). The JIRB is also funded by and makes its

---

**1.** This matter was addressed under the Disciplinary Rules of the Code of Professional Responsibility, inasmuch as the newer Rules of Professional Conduct did not become effective until April 1, 1988.

recommendations directly to this Court. In the exercise of its constitutionally established role, the JIRB is a part of the judicial system. As an officer of that system, Surrick was subject to the Code of Judicial Conduct, inasmuch as the Code provides,

> *Anyone, whether or not a lawyer, who is an officer of a judicial system performing judicial functions,* including an officer such as a referee in bankruptcy, special master, court commissioner, or magistrate, *is a judge for the purpose of this Code. All judges should comply with this Code* except as provided [in expressly enumerated exceptions not relevant here.]

(Emphasis added). Violations of the Code of Judicial Conduct are within the jurisdiction of the JIRB, not the Disciplinary Board. Pa. Const. Art. V, § 18(d).

In connection with Surrick's alleged breaches of confidentiality as a member of the JIRB, no disciplinary sanction has been sought by the JIRB. It is of interest to note, too, that the JIRB has filed an amicus brief in this appeal supporting Surrick's position that an attorney serving on the JIRB should not be subjected to jurisdiction of the Disciplinary Board of this Court for transgressions of the rules and mandates governing the JIRB. We agree. The Code of Judicial Conduct provides adequate constraints upon the conduct of JIRB members. Further, when a member of the JIRB has performed in such a manner as to provide cause for his removal, he can be removed from service by the appointing authority. Pa. Const. Art. V, § 18(b). With regard to the two non-judge attorneys having membership in the JIRB, the appointing authority is the Governor. Pa. Const. Art. V, § 18(a). The Governor did not, however, at any time seek to remove Surrick from service on the JIRB. Clearly, to the extent that a member of the JIRB breaches duties pertaining to membership in that body, appropriate remedies, including removal from office, are available. The disciplinary system governing members of the bar of this Court, as administered by the

Disciplinary Board, should not, however, be utilized in such situations.

The Disciplinary Board of the Supreme Court of Pennsylvania is, as its name implies, an instrument of this Court. See Pa.R.D.E. 103, 201, 205. Its members are appointed by us, and serve under our direction. The Board stands, therefore, as a formidable tool that has the potential of being utilized by deficient members of the judiciary as a means of discouraging attorneys from being vigorous in carrying out their JIRB duties. Vigorous independent participation by attorney-members of the JIRB is essential, for they have professional commitment, legal education, necessary perspective, and requisite experience with the court system, all of which provide valuable input into the judicial disciplinary process. An attorney who is obligated to review the conduct of the judiciary must not, even potentially, be subject to discipline in a forum the membership of which is controlled by those the JIRB is required to review, as the fear of disciplinary retribution could obviously act to stifle the free exercise of independent judgment.

The JIRB cannot be permitted to become a mere facade, allowing, or being perceived as allowing, judicial improprieties to go unchecked. To assure the proper functioning of the JIRB as an *independent* judicial body, see *First Amendment Coalition v. Judicial Inquiry and Review Board,* 501 Pa. at 132–33, 460 A.2d at 724, it is absolutely necessary that members of that body be immune from even the possibility of reprisals from those whose conduct is being evaluated. Attorney-members of the JIRB must not, and cannot, be placed in jeopardy by the inherent risk of offending members of the judiciary. If the disciplinary system for members of the bar could be invoked by the judiciary as a means of retaliating against attorneys who are members of the JIRB, the effectiveness of the JIRB would be diminished, and the public's trust in the JIRB and in the entire judicial system would suffer and be seriously eroded, encouraging a perception that the Disciplinary

Board is used by the judiciary to "protect their own" by deterring public criticism and review.

In short, the chilling effects of having an attorney's actions as a JIRB member subjected to review by the Disciplinary Board are substantially prejudicial to the functioning of the JIRB. Those effects outweigh the need for specialized attorney discipline in this realm, inasmuch as there are other adequate and effective processes available for dealing with JIRB members who deviate from their responsibilities. Accordingly, the jurisdiction of the Disciplinary Board in this matter cannot be sustained.[2]

Disciplinary proceeding dismissed.

LARSEN and McDERMOTT, JJ., did not participate in the consideration or decision of this case.

ZAPPALA and PAPADAKOS, JJ., filed a dissenting opinion.

ZAPPALA, Justice, dissenting.

Because I believe the majority ignores existing precedent regarding the disciplining of attorneys in the Commonwealth, thereby creating a serious obstacle for the future of our disciplinary system, I must dissent.

I cannot understand this Court's new philosophy regarding the characterization of an attorney's actions. In the past, we have held attorneys accountable for improper acts done apart from the exercise of their professional responsibilities because of the serious impact such improprieties can have on the system of justice as a whole. In *Office of Disciplinary Counsel v. Casety*, 511 Pa. 177, 512 A.2d 607 (1986), this Court readily disbarred Casety after he had pled guilty in California to voluntary manslaughter. In so doing we stated:

**2.** In view of our holding as to the scope of the Disciplinary Board's jurisdiction, we have no cause to address arguments that Surrick's disclosures of JIRB matters were protected from disciplinary sanction by free speech guarantees of the state and federal constitutions and that Surrick's conduct did not prejudice the administration of justice.

We see in Casety's conduct intemperance, as well as illegality and moral reprehensibility. As lawyers, we are bound to maintain high standards of professional conduct at all times.

. . . . .

Where one who has sworn to uphold the law actively breaches it, his fitness to practice is unquestionably destroyed. (citing *Office of Disciplinary Counsel v. Campbell*, 463 Pa. 472, 345 A.2d 616 [1975]). Casety's repudiation of society's rules and indulgence in alcohol and drug abuse and homicidal conduct were serious rejections of the oath he undertook to uphold the law. We cannot condone such conduct because it destroys public confidence in the legal profession. An attorney who shows such disrespect for the law has forfeited his privilege to be numbered as an attorney, and is not competent to represent members of the public or to appear before courts.

511 Pa. at 182–183, 512 A.2d at 610.

Likewise, in *Office of Disciplinary Counsel v. Simon*, 510 Pa. 312, 507 A.2d 1215 (1986) this Court disbarred Simon for acting as a middle man for the sale and purchase of four ounces of cocaine, notwithstanding that he received no personal or financial gain. In his defense, Simon argued that his conduct did not affect his ability to practice law and therefore he should not be disbarred. In response to this argument we stated:

We will not accept this distortion of DR 1–102(A)(6). The language of Pa.R.D.E. 203(a) clearly states to the contrary: the violation of the disciplinary rules are misconduct and "shall be grounds for discipline, *whether or not the act or omission occurred in the course of an attorney-client relationship.*" (Emphasis supplied.) As we stated in *Office of Disciplinary Counsel v. Grigsby*, 493 Pa. 194, 425 A.2d 730 (1981), "... we cannot distinguish between dishonesty involving client matters and dishonesty in private matters: the seriousness of respondent's misconduct is not lessened by the fact that the victims of

his fraud were not his clients." *Id.*, 493 Pa. at 200, 425 A.2d at 733.

510 Pa. at 321, 507 A.2d at 1220.

Finally, in *Office of Disciplinary Counsel v. Stern*, 515 Pa. 68, 526 A.2d 1180 (1987), we refused to accept the recommendation of the Disciplinary Board that Stern be given a public censure but instead ordered his disbarment for delivering funds used to facilitate bribery. The basis for our decision was our perceived responsibility to protect the public from unscrupulous lawyers and to preserve public confidence in both the legal profession and the judicial system.

Now, the majority retreats from the well-reasoned position that we may discipline an attorney notwithstanding the fact that the acts complained of did not arise from or affect his actual practice of law. The majority has chosen this course notwithstanding that the respondent has demonstrated a disregard for one of the most sacred, protected and necessary responsibilities of an attorney—the ability to maintain confidentiality. Can a lawyer who breaches his oath to maintain a confidence mandated by the Constitution be trusted to maintain the confidences of his clients?

The charges levied against the respondent are serious and greatly impact upon his ability to act as a member of the bar of this Court. The evidence clearly supports the allegation that the respondent breached his duty of confidentiality. What circumstance distinguishes this character flaw from that of Casety, Simon and Stern, all of whom we had no problem disbarring? I can find none.

I also reject the majority's premises that disciplinary jurisdiction of the respondent must *either* be in the Disciplinary Board *or* in the JIRB (or elsewhere), but cannot be in both. Were this premise true, the Disciplinary Board would have no power to review the fitness to practice law of a judge who had been removed from the bench after JIRB proceedings. It seems obvious to me that the Board, acting on behalf of this Court, has not only the power but the duty to conduct such a review. *See generally*, Annot., 57 A.L.

R.3d 1150 (1988). We have elsewhere acknowledged that our power to supervise the bar is not exclusive, that an attorney can be subject to the requirements imposed by this Court and to others imposed by the legislature, cf. *Maunus v. Commonwealth, State Ethics Commission,* 518 Pa. 592, 544 A.2d 1324 (1988). Even if we accept the notion that another body might have authority to call the respondent to account for his conduct, we need not abjure our own power to do likewise in the protection of interests under our supervision.

Finally, with the stroke of a pen, the majority, in essence, transfers control of all appointed masters, common law arbitrators and statutory civil arbitrators from our Disciplinary Board to JIRB. It would seem that now every attorney who serves as a Master in a divorce proceeding, a hearing officer, a member of the American Arbitration Association or a court appointed civil arbitration board, is no longer subject to discipline by our Disciplinary Board but rather is subject to the JIRB. Like the respondent's position on the JIRB, each of these positions requires the performance of "judicial functions". Treating all of these positions as "judicial officers" for the purpose of discipline will impose on the JIRB a result neither prescribed nor intended by our Constitution.

I also cannot agree with the majority's internal, contradictory approach to the enforcement of ethics code violations in the cases such as that of the respondent. On the one hand, the majority elevates the attorney and lay members of the JIRB to the status of "judges" for purposes of determining jurisdiction for disciplinary matters. On the other hand, the majority (and properly so) indicates that those same members may only be removed (disciplined) by the appointing authority. Thus, the majority protects the respondent from the jurisdictional reaches of the Disciplinary Board and this Court on the basis that he is a "judge" and therefore only subject to the JIRB. However, since the respondent was appointed to the JIRB by the governor, this Court cannot administer any discipline. I cannot imagine a

more futile process than for the JIRB to conduct investigations, hold hearings, and recommend appropriate discipline to this Court (for such are its functions as set out in the Constitution), if this Court has no power to act on the recommendation. The majority, however, ignores this absurd result and glosses over it by deeming it satisfactory that the appointing authority can remove any member who commits an inappropriate act.

The majority's simplistic definitional exercise, whereby one becomes subject to JIRB jurisdiction merely by doing the kinds of things a judge does ("exercising judicial functions" as the majority has it) is hardly satisfactory. Although the term "judicial officers" is broadly defined as "judges, district justices and appointive judicial officers", 42 Pa.C.S. § 102, the statutory provision implementing the Constitutional provision creating the JIRB, authorizes only the power to discipline or remove judges. 42 Pa.C.S. § 3331(a). Article V, § 18 itself speaks only of the JIRB investigating and recommending action against a *justice or judge.* The process for removal of district justice is left to be governed by general rule, 42 Pa.C.S. § 3331(b), although we have adopted a rule that, in essence, brings district justices within JIRB jurisdiction by including them within the definition of "judge" for purposes of JIRB rules. *See,* JIRB Rule 23(b). Whatever positions are covered by the term "appointive judicial officers", neither the Constitution nor the statute enumerating JIRB's powers authorizes the JIRB to discipline them. If an attorney serving a judicial function commits an improper act, then under the majority's rational, that attorney may be barred from serving in a judicial capacity but not as a practicing attorney of this Commonwealth. Such a result is absurd.

I cannot condone this perversion. Accordingly, I must respectfully dissent.

PAPADAKOS, Justice, dissenting.

When Mr. Surrick was admitted to the bar of this Commonwealth, he took, as a pre-requisite to admission, the following oath of office:

I do solemnly swear (or affirm) that I will support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth and that I will discharge the duties of my office with fidelity, as well as to the court as to the client, that I will use no falsehood, nor delay the cause of any person for lucre or malice.

This requirement is embodied in our Bar Admission Rules, Pa.B.A.R. 231(a)(2), and mandated by statute, 42 Pa.C.S.A. § 2522, which reads:

Before entering upon the duties of his office, each attorney at law shall take and subscribe the following oath or affirmation before a person authorized to administer oaths:

I do solemnly swear (or affirm) that I will support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth and that I will discharge the duties of my office with fidelity, as well as to the court as to the client, that I will use no falsehood, nor delay the cause of any person for lucre or malice. Any person refusing to take the oath or affirmation shall forfeit his office.

It follows that any person violating this oath or affirmation forfeits his office. For otherwise, the oath would be mere tapestry, meaningless and a cruel joke upon the citizenry of our Commonwealth who expect honor and integrity from all those persons of a public official nature in whom the public place their trust.

We have always been of the view that all conduct by members of the bar which falls below the standards imposed upon them by our Rules of Professional Conduct and by virtue of their membership in the Bar, subjects them to the review of our Disciplinary Board and this Court. The mere fact that the same misconduct violates the Code of Judicial Conduct or the Penal Laws of Pennsylvania should not deprive the Disciplinary Board of jurisdiction to determine whether the misconduct has violated any of the Disciplinary Rules of the Code of Professional Responsibility.

It makes no difference whether the conduct complained of is committed by an attorney in or out of his or her professional capacity. Both are subject to review by the Disciplinary Board because in both instances an attorney's conduct has brought him and the bar into disrepute. Thus, we not only discipline attorneys who act unethically in their professional capacity, but similarly discipline those attorneys who commit crimes or who engage in conduct that is not criminally punished but nevertheless falls short of the standards expected of all members of the bar even though that conduct had nothing to do with the attorney's professional life or does not arise out of an attorney-client relationship. "We cannot distinguish between dishonesty involving client matters and dishonesty in private matters: the seriousness of respondent's misconduct is not lessened by the fact that the victims of his fraud were not his clients." *Office of Disciplinary Counsel v. Ewing*, 496 Pa. 35, 436 A.2d 139 (1981).

The record in this case clearly reveals that an attorney-member of the Judicial Inquiry and Review Board (JIRB) disclosed to the public confidential information. The ban against disclosure of information pending before the JIRB is constitutionally mandated in Article V, Section 18(h) of the Pennsylvania Constitution and in the Rules of Procedure governing the JIRB (Rule 20) and applies to all members of the JIRB and parties appearing before it.

The act of disclosing confidential information under these circumstances is a failure to obey the express terms of the Constitution of this Commonwealth and the only question is whether such conduct, the express violation of his oath of office as an attorney, subjects him to review by the Disciplinary Board and discipline by this Court.

It seems to me that if the Disciplinary Board has jurisdiction in cases where attorneys sell drugs, steal money, rob or kill, in non-attorney-client settings, then it similarly has jurisdiction over Mr. Surrick who knowingly and intentionally refused to obey and support the very Constitution that he was charged with supporting, obeying and defending. I

believe that his conduct has been properly brought before the Disciplinary Board and that he should be disbarred. *Cf. In Re Greenberg*, 442 Pa. 411, 280 A.2d 370 (1971), wherein this Court suspended Common Pleas Judge Greenberg because of criminal conduct committed while he was a practicing lawyer and *before* he had become a judge.

I strongly must dissent to the majority's contrary conclusions in this case for, in my mind, the majority's approach is riddled with inconsistencies and will create more problems than it solves.

First, the majority makes much of the fact that the JIRB is a free and independent constitutionally created body. How free and *independent* is JIRB when a Chief Justice assumes authority over it to *direct* its actions? For Chief Justice O'Brien did not *request* that an inquiry be commenced in the conduct of Mr. Justice Larsen. He *directed* that such an inquiry be made. (Page 884 of the majority opinion.) Can a Chief Justice or any Justice of this Court also *direct* JIRB to discontinue an inquiry?

How free and *independent* is JIRB when a Chief Justice can influence JIRB in the hiring of a particular lawyer to act as special counsel as is reported was done in the Larsen I inquiry?

JIRB is a constitutionally created board which simply obtains and sifts through information and creates a record for this Court to review in cases of judicial misconduct. It is not a sacred cow or idol that requires veneration. We are free to accept or reject any and all of JIRB's findings and recommendations as we often do, and I think it is a mistake to elevate this fact-finding board to anything more than it really is—our constitutionally appointed hearing body.[1]

Second, to assume that members of the JIRB act as judicial officers subject only to the Code of Judicial Conduct

---

1. In both *In the Matter of: Judge Joseph P. Braig*, 520 Pa. 409, 554 A.2d 493 (1989), and *In the Matter of: Judge Esther R. Sylvester*, 521 Pa. 300, 555 A.2d 1202 (1989), we recently rejected the controlling findings of fact and the recommendation of the Board, made our own findings of fact and exonerated both Judges from any wrongdoing.

will create a myriad of unforeseen problems. If lawyer members of JIRB are subject to the Code of Judicial Conduct because they are acting in a judicial capacity, then what are we to do with lawyer members of the current board if they lend their names to money-raising ventures or if they donate money for political campaigns? Has Mr. Surrick engaged in political activities while serving as a member of JIRB? Has former Justice Bruce Kauffman engaged in political activity while serving as the attorney member of the Board? Have any of the other lawyer members of the Board engaged in political activities while serving as members of JIRB? Does the majority infer that these lawyer-members of the Board may be in violation of Canon 7 of the Code of Judicial Conduct which provides:

**CANON 7. A JUDGE SHOULD REFRAIN FROM POLITICAL ACTIVITY INAPPROPRIATE TO HIS JUDICIAL OFFICE.**

**A. Political Conduct in General**

(1) A judge or a candidate for election to judicial office should not:

(a) act as a lender or hold any office in a political organization;

(b) make speeches for a political organization or candidate or publicly endorse a candidate for public office; except as authorized in subsection A(2);

**Commentary**

A candidate does not publicly endorse another candidate for public office by having his name on the same ticket.

(c) solicit funds for or pay an assessment or make a contribution to a political organization or candidate, attend political gatherings, or purchase tickets for political party dinners, or other functions, except as authorized in subsection A(2)....

As to Mr. Surrick, I am interested to know, since he is no longer a member of JIRB, what jurisdiction JIRB has over

him now and what discipline can it or we impose? He cannot be removed from the JIRB, since he no longer serves on it; his *judicial* salary cannot be taken from him, since he earns none; and he cannot be suspended as a judicial officer, since he does not serve in that capacity.

Third, if the majority means that judicial officers can be disciplined *only* under the Rules of Judicial Conduct for their judicial transgressions, does that mean that we are powerless to remove from the bar, or otherwise sanction, those members of the judiciary whom we have removed because of their transgressions as judicial officers?

In short, I believe the majority has raised a smoke screen to permit one individual to escape, but which may suffocate the entire judiciary of Pennsylvania. Mr. Surrick violated the Constitution and his oath of office as an attorney by his conduct. If he wishes to reveal confidences that others are compelled to keep, so be it. But he cannot put himself above the law and expect to be able to enjoy the privilege of representing others under our system of laws. Whether the constitutional mandate of confidentiality is appropriate or not is not for us to decide but for the people of this Commonwealth who have the ultimate authority in such matters.

Those former jurists who have prejudiced the proper administration of justice and brought the judicial office in disrepute thus undermining public confidence in our judicial system, and have caused their removal from the upper side of the bench, may now sleep easier because they have today been given immunity from disciplinary action as lawyers and may practice from the lower side of the bench which they have disgraced. Apparently, the majority is blind to the fact that their misconduct will have deleterious consequences on the integrity of the Bar of Pennsylvania. On the other hand, perhaps these former jurists should hold their breath. This Court has recently acquired a flair for reversing itself, so that this opinion may represent a ticket

good for one ride only.[2] I, too, will hold my breath, waiting to see how this Court will extricate itself from the bind in which it has placed itself and our Disciplinary Board.

I would disbar Mr. Surrick without hesitancy and sustain the jurisdiction of the Disciplinary Board in this case.[3] Hence, I dissent.

**2.** See, *Commonwealth v. Weakland,* 521 Pa. 353, 555 A.2d 1228 (1989); and *Commonwealth v. Leon Williams,* 521 Pa. 556, 559 A.2d 25 (1989).

**3.** Other states have recognized the jurisdictions of their lawyer disciplinary board over lawyers who have committed transgressions while serving in various public capacities. Former President Richard M. Nixon resigned from the Bar of California as of October 24, 1974, with charges pending against him. His resignation was accepted without prejudice to further proceedings should he ever seek reinstatement.

Former Vice President Spiro T. Agnew was disbarred in Maryland on May 2, 1974, following his conviction in Federal Court.

The late Governor Otto Kerner, Jr., of Illinois, was disbarred on August 2, 1974, for transgressions he committed while sitting as a judge.

Judge Claiborne of the Federal District Court for the District of Nevada was subjected to a disbarment action in his home state of Arkansas and he voluntarily resigned before any proceedings took place.

See also, Annotation, Misconduct in Capacity as Judge as Basis for Disciplinary Action Against Attorney, 57 A.L.R.3d 1150, in which some 27 states are cited as reasoning that: "... misconduct in any capacity whatsoever, including a judgeship, reflects upon an attorney's fitness to practice law and is consequently a proper ground for discipline." 57 A.L.R.3d 1158. See also, *U.S. re Gilbert,* 276 U.S. 294, 48 S.Ct. 309, 72 L.Ed. 580, (1928) cited therein.

Eleven judges implicated in the Greylord proceedings in Illinois were disbarred on consent in 1984–1988.