595 A.2d 42

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner**

v.

**ANONYMOUS ATTORNEY A,**

**Anonymous Attorney E,**

**Anonymous Attorney H,**

**Anonymous Attorney D,**

**Anonymous Attorney C,**

**Anonymous Attorney B,**

**Anonymous Attorney F,**

**and**

**Anonymous Attorney G,**

**Respondents.**

Supreme Court of Pennsylvania.

Argued May 8, 1990.
Decided July 18, 1991.

---

Barbara S. Rosenberg, Asst. Disc. Counsel, Deborah A. Cackowski Chief Disc. Counsel, Marcia L. Stein, Barbara S. Rosenberg, Marcia J. Lieberman, Philadelphia, for petitioner.

Samuel C. Stretton, Chester, James E. Beasley, Barbara R. Axelrod, John Rogers Carroll, Stephen P. Gallagher, Michael J. Stack and Stanford Shmukler, Philadelphia, for respondents.

Mary R. Fante Cunningham, pro se.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS, and CAPPY, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

The question presented to this Court is whether the

Judicial Inquiry and Review Board (JIRB)[1] has exclusive jurisdiction to discipline Judicial officers for misconduct; so as to preclude action by the Disciplinary Board[2] against those same Judicial officers who are also attorneys registered to practice law in the Commonwealth of Pennsylvania. We find that exclusive jurisdiction lies with JIRB and reverse in part and affirm in part, although for other reasons, the order of the Disciplinary Board.

## PROCEDURAL HISTORY

We address the eight separate appeals in a single opinion due to the intertwining nature of the facts and procedures and the overlapping of issues involved in each case. Where necessary, we will underscore the differences among the respondents and separately address individual issues.

The eight respondents in this case were removed from judicial office by order of this Court dated February 25, 1988.[3] Their removal from office, following a complete investigation by JIRB, was predicated on a finding by this Court that they had each been guilty of misconduct while in judicial office.[4] Each of the eight respondents was found to have violated Canons 1, 2, 5(C)(1) of the Code of Judicial Conduct and Article V, Section 17(c) of the Pennsylvania Constitution.

Subsequent to the loss of their judicial office, all of the respondents applied for active status before the Bar of the Supreme Court for purposes of resuming the practice of

1. The Judicial Inquiry and Review Board was created by amendment to the Pennsylvania Constitution, adopted April 23, 1968. *See,* Article V, Section 18, Pa. Const.

2. The Disciplinary Board was created by this Court pursuant to its inherent power to supervise the attorneys of this Commonwealth under Article V, Section 10 of the Pennsylvania Constitution. *See,* The Pennsylvania Rules of Disciplinary Enforcement.

3. The caption and citation of that action has been omitted in order to protect the respondents' rights to confidentiality pursuant to Pa.R.D.E. 402.

4. Respondent B had not yet taken the oath of office at the time of her misconduct but, as a judge-elect, was held to the constitutional and ethical standards of a judge.

law. By letter of inquiry dated February 7, 1989, the Office of Disciplinary Counsel notified each of the respondents that they were being investigated for possible violations of the Disciplinary Rules of the Code of Professional Responsibility.[5] Disciplinary Counsel's investigation involved the same operative facts underlying the previous judicial discipline.[6]

In their response to the letters of inquiry, the respondents raised various issues questioning the propriety of the investigation. Serious questions arose as to Disciplinary Counsel's jurisdiction to proceed in this matter; prompting Counsel to file with the Disciplinary Board a "Petition for Determination of Preliminary Legal Matters." Although the Board generally does not become involved in disciplinary matters during the investigative stage, they made an exception in this case because of the substantial jurisdictional question at issue. *See,* Pa.R.D.E. 205.

On June 7, 1989, the Board entered an order directing each respondent to raise by preliminary motion any issue which might bar further proceedings in these matters. Oral argument was held before four members of the Board on September 8, 1989.[7] The Board issued their opinion and order on October 24, 1989 with one member dissenting. Essentially the Board found that Disciplinary Counsel could proceed with its investigation against all of the respondents except anonymous attorneys C, F and E. The Board dis-

5. Anonymous Attorneys A and B were charged with violations of Rules 1–102(A)(3), 1–102(A)(4), 1–102(A)(5), 1–102(A)(6) and 8–101(A)(3). Anonymous Attorneys D and E were charged with violations of Rules 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), and 8–101(A)(3). Anonymous Attorneys C, F, G and H were charged with violations of Rules 1–102(A)(5), 1–102(A)(6) and 8–101(A)(3).

6. Effective April 1, 1988 the Code of Professional Responsibility was replaced with the Rules of Professional Conduct. The misconduct at issue occurred before March 31, 1988, and is therefore governed by the Code of Professional Responsibility. The violations of the Disciplinary Rules at issue herein correspond to violations under the present Code at Rule 8.4 sections (b), (c), (d) and (f).

7. Respondent B did not participate in the Oral argument, but agreed to have the issues as they pertain to him/her decided on the basis of the motions and briefs.

missed certain charges based on allegations of misconduct which it deemed to be solely judicial in nature, as to all of the respondents.

Disciplinary Counsel petitioned this Court for allowance of appeal from the order of the Board as to all the respondents. The petition for allowance of appeal was granted.

## FACTUAL SUMMARY

The facts vary slightly as to each of the respondents. The conduct at issue before the Disciplinary Board is identical to that which was before the JIRB involving these same respondents. The disciplinary charges against all of the respondents stem from their receipt of a sum of money ranging in amounts from $200 to $500 from a "union" [8] during the Christmas seasons of 1983, 1984 or 1985, hereinafter referred to as "Christmas cash." Some of the respondents failed to disclose these gifts as required, beginning in 1984, on their annual "Statement of Financial Interest." [9] Several of the respondents concealed their receipt of Christmas cash from the FBI during that agency's investigation of the union in question. Two of the respondents are alleged to have entered into a conspiracy to grant special treatment to members of the union who might appear before them during their tenure as judicial officers. The specific facts as to each respondent shall be briefly summarized.

The factual situations of respondents C and F are identical. Both respondents received $300 Christmas cash from the union in December of 1985. They both reported the receipt of these funds as required on their Statements of Financial Interest. As a result of these transactions the judicial office of each respondent was declared vacant; they were not barred from attaining future judicial office.

**8.** The name of the Union shall not be disclosed because of the confidentiality of the proceedings. It shall be referred to hereinafter as "union."

**9.** *See,* Supreme Court Order 47 of the Judicial Administration Docket No. 1 dated April 13, 1984.

Respondent D received $300 in Christmas cash from the union in December of 1985, and failed to report the gift on his annual Statement of Financial Interest. Respondent D is further charged with a disciplinary violation for deliberately misleading FBI investigators. Respondent D resigned his judicial office prior to the conclusion of the JIRB proceedings arising from this incident. This Court did not enter an order removing respondent from office as it would have been redundant in light of the resignation, however, respondent D was barred from future judicial office.

Respondent E received Christmas cash in the amount of $200 from the union in 1983 and 1984, and $300 in 1985. The 1985 gift was reported on the annual Statement of Financial Interest, but not the 1984 gift. Respondent E was removed from judicial office and declared ineligible for future judicial office.

Respondent G received $300 of Christmas cash in 1983, before disclosure of such gifts was required, and another $300 in 1985 which was reported. Respondent G was found to have deliberately misled the FBI during their questioning regarding receipt of the money and the relationship between respondent G and the union. Respondent G was removed from judicial office and declared ineligible for future office.

Respondent H received $300 of Christmas cash in 1985 which was reported on the annual Statement of Financial Interest. This respondent was further found to have deliberately misled the FBI during their investigation of the union. Respondent H was removed from judicial office and declared ineligible for future office.

Respondent A is charged with receipt of Christmas cash in the amount of $200 in 1983 and 1984 and $500 in 1985.[10] The 1985 gift was properly disclosed on the annual Statement of Financial Interest. Respondent A was found to be deliberately misleading to the FBI and a Federal Grand Jury during their investigation of the union. Disciplinary

10. In the previous JIRB proceedings the allegations concerning the 1983 and 1984 gifts were withdrawn.

Counsel makes an allegation that respondent A abused his office by granting a new trial in a criminal case after he received a phone call from the president of the union. This particular allegation had not been part of the JIRB investigation against this respondent. Respondent A was removed from judicial office and declared ineligible for future office.

Respondent B accepted $300 of Christmas cash from the union in 1985, at which time respondent had been elected to judicial office but had not yet taken the oath of office. Upon receipt of the Christmas cash, Respondent B was found to have entered into an agreement with the union to treat any members thereof appearing in respondent's court favorably. Respondent B was removed from judicial office and barred from future office.

With the exception of respondent A, all of the facts underlying the Disciplinary charges herein are identical to the facts which motivated the previous JIRB actions against these respondents.

## OPINION OF THE BOARD

In this case the Disciplinary Board is seeking to assert their jurisdiction over the activities of these respondents which occurred at the time respondents were judicial officers.[11] The Board bases its claim of jurisdiction on Rule 201(a)(5) of the Pennsylvania Rules of Disciplinary Enforcement (Pa.R.D.E.), which provides:

### RULE 201. JURISDICTION

(a) The exclusive disciplinary jurisdiction of the Supreme Court and the Board under these rules extends to:

(5) Any attorney who resumes the practice of law, with respect to **nonjudicial** acts while in office as a justice, judge or district justice. (emphasis supplied)

---

**11.** Respondent B had alleged during the JIRB investigation that as a judge elect JIRB did not have jurisdiction, this Court rejected that argument and found that jurisdiction did in fact lie with JIRB. *In the Matter of Cunningham,* 517 Pa. 417, 446 fn. 26, 538 A.2d 473, 488 fn. 26 (1988).

Applying this Rule to the case at bar, the Board developed an interpretation of nonjudicial acts revolving around the type of misconduct at issue and held:

In our view, an act of misconduct is judicial in nature when it meets both of the following criteria:

a) The act under scrutiny is primarily a violation of the unique responsibilities peculiar to judicial office; and

b) the act under scrutiny does not involve illegality, moral turpitude or pervasive dishonesty.

If a judge while in office commits offenses which fail to meet both criteria, such acts are nonjudicial acts of misconduct, justifying prosecutorial action by the Office of Disciplinary Counsel. (Disciplinary Board Opinion of October 24, 1989 at pp. 18, 19.)

Utilizing this criteria the Board looked at the specific charges as brought under the Code of Professional Responsibility to determine with which charges Disciplinary Counsel would be able to proceed. The allegations concerning the receipt of Christmas cash and the failure to report same, were found to be "purely judicial misconduct." Thus, the disciplinary charges against respondents C, F and E were dismissed in their entirety, and the charges against the other respondents pertaining to receipt of Christmas cash and failure to report such were also dismissed for lack of jurisdiction.

The Board did find jurisdiction to continue with the remaining charges against respondents D, G, and H on the basis of their misleading statements given to the FBI. Respondent A also is charged with a disciplinary violation for misleading the FBI and jurisdiction was found by the Board as to that allegation. The Board separated this specific misconduct from the receipt of the Christmas cash on the grounds that it involved "pervasive dishonesty," and thus was nonjudicial conduct. Jurisdiction was also found as to respondents A and B regarding the allegations that they conspired to arrange for favorable treatment of union members appearing in their courtrooms. The Board found

the charges against A and B to constitute illegal conduct involving moral turpitude.

The Board's rationale revolves around the type of conduct at issue as opposed to whether the actor committed the act while in a judicial capacity. The Board creates a category of judicial misconduct which limits itself to those acts which are improper only because they are committed by a judge. Therefore, nonjudicial acts are those which are inherently wrong in and of themselves regardless of whether or not the actor is wearing a judicial robe at the time the misconduct occurs. In essence, the Board is saying that judges are impartial arbiters of disputes and that a judicial act of misconduct can only be one which relates to a judge's official function. Acts of dishonesty and moral turpitude can never relate to the official function of a judge and therefore such acts are nonjudicial.

This judicial/nonjudicial categorization created by the Board to resolve the unusual situation presented by the facts in these cases does not bear up well under scrutiny. It strains reason to find that the respondents who accepted Christmas cash committed a *judicial* act, because the cash was offered as an attempt to win favor from a "judge," but the respondents who lied about receiving cash that was offered in an attempt to curry their favor committed *nonjudicial* acts. To find further that the respondents who accepted the cash and displayed an intent to let the gift sway their judicial conduct committed *nonjudicial* acts is a true stretch of logic.

Although we find the Board's logic to be unsound we reverse for a more fundamental reason.

## DISCUSSION

The Pennsylvania Constitution rests sole jurisdiction for the discipline of all Commonwealth Justices, Judges and District Justices in the Judicial Inquiry and Review Board and this Court. Article V, Section 18 of the Pennsylvania Constitution created the Judicial Inquiry and Review Board, established its membership, powers and its scope of review

regarding the conduct of members of the judiciary. The Section is entitled *Suspension, removal, discipline and compulsory retirement,* and provides that the sanctions as set forth in the title be enforced for the following types of violations:

**Article V, Section 18(d):**

Under the procedure prescribed herein, any justice or judge may be suspended, removed from office or otherwise disciplined for violation of section seventeen of this article, misconduct in office, neglect of duty, failure to perform his duties, or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute and may be retired for disability seriously interfering with the performance of his duties.

Section 18(d) sets forth six specific types of conduct which would trigger a JIRB proceeding. The very first type of activity prohibited is a "violation of section seventeen of this article." Section 17 of the Constitution, entitled *Prohibited activities,* expressly provides in subsection (b): "Justices and judges shall not engage in any activity prohibited by law and shall not violate any **canon of legal or judicial ethics** prescribed by the Supreme Court."

The Constitution specifically confers jurisdiction upon JIRB to investigate judicial officers for violations of the canons of legal ethics. "When the Constitution clearly sets forth the manner in which something shall be done, that procedure must be followed to the exclusion of all others...." *Consumer Party of Pennsylvania v. Commonwealth of Pennsylvania,* 510 Pa. 158, 179, 507 A.2d 323, 333 (1986).

This constitutional scheme empowers only JIRB to bring actions against judicial officers for any allegations of misconduct which arise during that officer's tenure in the judiciary. The types of conduct which will trigger a JIRB investigation are not limited to actions which relate solely to a judicial officer's official functions. The scope of review by JIRB over actions of a member of the judiciary was

discussed by this Court in *Matter of Dalessandro*, 483 Pa. 431, 397 A.2d 743 (1979):

> The constitution is concerned with official conduct that brings the judicial office into disrepute. This is not to say that no standard was placed in the constitution concerning conduct of a judge unconnected with conduct in an official capacity. As pointed out, the first item in Article 5, Section 18(d) refers us to Article 5, Section 17. The relevant provision in that section contains a broad prohibition. It does not speak of conduct of the judge in his official capacity nor does it speak of that which concerns the judicial office. It specifically covers all conduct of a judge, and unlike the provisions of Article 5, section 18(d), it is written without any qualifying or restrictive language. *Id.*, 483 Pa. at 458, 459, 397 A.2d at 756, 757. (emphasis supplied)

■ JIRB's authority to investigate allegations of misconduct concerning members of the judiciary is not restricted to conduct of a judge in his official capacity. Nor is JIRB's jurisdiction limited by the status of the judicial officer at the time the misconduct occurred or at the time the investigation into it has culminated. In *In re Greenberg*, 442 Pa. 411, 280 A.2d 370 (1971),[12] this Court, upon recommendation by JIRB, ordered the suspension of a judicial officer for misconduct which occurred before the judge ascended to the bench. The facts in that case are that Judge Greenberg was appointed to the bench in August 1965, subsequently elected to a full term, and in March 1968 was indicted in Federal District Court for the Eastern District of Pennsylvania for crimes allegedly committed during the period from September 1961 to July 1965. Judge Greenberg was convicted of 21 counts of mail fraud on April 20, 1970. This Court specifically rejected the argument that suspension was a harsh and inappropriate sanction as the conduct at issue did not involve judicial

12. Judge Greenberg was granted a Presidential pardon, thus compelling this Court to lift the order of suspension. *In the Matter of Greenberg*, 457 Pa. 33, 318 A.2d 740 (1974).

behavior and, in fact, occurred before Judge Greenberg became a judge. In answer to that assertion the Court stated:

In the first place, we do not sit in judgment of Judge Greenberg nor mete out punishment to him; that is solely within the competence of the federal court in which he was tried and convicted. What we seek to do is to maintain the integrity of the office of judge to the end that that office, and through it the administration of justice, will deserve and receive the support not only of litigants and lawyers but of the public as well. It may be granted that the problem would be aggravated had the crime been committed while Judge Greenberg was holding judicial office, but this does not alter the facts before us; ... For the purpose of upholding the dignity of the judicial office and the integrity of the judicial process, we cannot place judicial duties or activities into compartments; they are of one pattern and one cloth. *Id.*, 442 Pa. at 418, 280 A.2d at 373.

The power of this Court to entertain sanctions recommended by JIRB after the judicial officer in question has left the bench was answered affirmatively in *Judicial Inquiry and Review Board v. Snyder*, 514 Pa. 142, 523 A.2d 294 (1987); and *In the Matter of Glancey*, 518 Pa. 276, 542 A.2d 1350 (1988). In *Snyder*, Judge Snyder lost his bid for re-election during the pendency of a JIRB investigation regarding his bias in the handling of a particular trial. This Court rejected the argument that the investigation into his alleged acts of judicial misconduct was thus moot.

The election results, however, have not ended our responsibility where other issues remain. This Court is responsible for maintaining the integrity of judicial administration so as to uphold public respect for the rule of law. Once instituted, our jurisdiction over disciplinary proceedings is thus only at an end when we issue a final order. [citations omitted] *Id.* 514 Pa. at 151, 523 A.2d at 298, 299.

The above principle of *Snyder*, was applied with the same result in *Glancey*. Judge Glancey had resigned from judi-

cial office and agreed to refrain from seeking future judicial office during the pendency of a JIRB investigation into allegations that he had received christmas cash from a union and had lied to the FBI about the receipt of that money. This Court rejected Judge Glancey's argument that his resignation rendered moot any further action on the JIRB investigation. *Id.* 518 Pa. at 283, 542 A.2d at 1353.

In the context of the cases at bar we are not taking the position that the respondent's actions did not violate both the Canons of legal and judicial ethics. However, the conduct in question arose while the respondents were judicial officers and the type of misconduct was intrinsically tied to the position of respondents as judicial officers. The fact that respondents were judges was the *primary ingredient* in this entire scenario that made the respondents' actions so outrageous.

The charges that are being levied against these respondents by Disciplinary Counsel under the Code of Professional Responsibility are equivalent to the charges brought against respondents during the JIRB proceedings under the Code of Judicial Conduct. These respondents were found to have violated canons 1, 2 and 5(C) of the Judicial Code which prohibits judges from engaging in the same type of conduct as lawyers are prohibited from engaging in by sections 1–102(A)(3) through (A)(6) and 8–101(A)(3) of the Code of Professional Responsibility. The language in the respective Codes is not identical. However, the sections at issue require judges and lawyers, respectively, to adhere to the highest standards of conduct, to refrain from any activity prejudicial to the administration of justice and to refrain from accepting gifts offered with the intent of influencing their professional judgment. In fact a comparison of the Code sections reveals that although they require similar standards of conduct judges are held to a higher measure.[13]

13. The Commentary following Canon 2 of the Code of Judicial Conduct reflects this requirement: "He [judge] must expect to be the subject of constant public scrutiny. He must therefore accept restric-

 Nor do we conclude that JIRB neglected its responsibility as to these respondents by not also requesting sanctions against them as lawyers during the preceding JIRB investigation.[14] As Mr. Chief Justice Nix recently stated in the *Matter of Cunningham*, 517 Pa. 417, 538 A.2d 473 (1988), misconduct by a judge carries more significant impact than misconduct by an attorney and consequently requires a more severe sanction.

It is important to underscore the distinction between the suspension or disbarment of a lawyer [citation omitted], and the suspension or removal of a judge. The practice of law is a private pursuit, even though it has a significant impact upon a public function. Where a lawyer is found to have been derelict in his or her responsibilities, it primarily affects those who elect to repose their trust in that individual. In such cases, disciplinary action is necessary to prevent a continuation of the objectionable behavior and to repair where possible the damage to the integrity of the process that resulted from the errant conduct. By suspension or disbarment the miscreant is prevented from causing further harm and his or her responsibilities can be assumed by others who will faithfully discharge them.... Where a judicial officer breaches the trust vested in one holding that office, the injury is further compounded because a public trust has been betrayed. [footnote omitted] *Id.*, 517 Pa. at 424, 425, 538 A.2d at 477.

The purpose for entrusting judicial discipline to JIRB begins with the fact that judges must be held to a higher standard because of the nature of their function. We cannot tolerate a situation where an individual lacking in strong moral character sits as judge over the conduct of others. Interrelated to our need for judicial officers of the

tions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly."

14. Article V, Section 18(*l*) of the Constitution provides for removal of a judicial officer upon disbarment, thus, impliedly conferring authority to JIRB to recommend such a sanction to this Court when appropriate.

highest integrity is our need for an independent judiciary. It was that principle of independence which this Court recently addressed in *Office of Disciplinary Counsel v. Surrick,* 521 Pa. 264, 555 A.2d 883 (1989).

In *Surrick,* a three member majority of this Court prohibited Disciplinary Counsel from bringing an action against an attorney for misconduct which occurred while that attorney was serving on the Judicial Inquiry and Review Board. Finding that the attorney, Surrick, was acting as an officer of the judiciary at the time his misconduct took place, and that the misconduct at issue was related to his service as a JIRB member,[15] that majority prohibited Disciplinary Counsel from proceeding with an investigation. That majority held that any action against Surrick must come from JIRB not Disciplinary Counsel; to allow otherwise would cripple the concept of an independent judiciary.

## CONCLUSION

The Pennsylvania Constitution mandates the procedure for bringing disciplinary actions against judicial officers. That procedure requires all such actions to be brought by a JIRB investigation culminating with a review of the entire record by this Court. No other body or agency has jurisdiction to bring an action against a judicial officer for misconduct which occurred during his tenure in office or which came to light during that time. It is for JIRB and JIRB alone to determine whether, in addition to, or as an alternative to, recommending sanctions of removal or suspension from judicial office, it will also recommend disciplinary sanctions. Whatever sanctions JIRB recommends are subject to final review by this Court.

**15.** The Disciplinary Board of the Supreme Court of Pennsylvania found that Surrick had violated the prohibition against the disclosure of confidential information mandated by Article V, Section 18(h) of the Pennsylvania Constitution, and Rule 20 of the Pennsylvania Rules of Proceedure Governing the Judicial Inquiry and Review Board. (In addition, this constitutional mandate was implemented by the legislature at 42 Pa.C.S.A. § 2101 et seq.)

The opinion of the Disciplinary Board is affirmed in part, and reversed in part for the reasons set forth herein. The appeal by Disciplinary Counsel is Dismissed and the Motions to Dismiss filed on behalf of each of the Respondents are Granted.

McDERMOTT, J., did not participate in the consideration or decision of two of the appeals considered herein at No. 44 DB 89 and No. 48 DB 89.

PAPADAKOS, J., files a dissenting opinion.

PAPADAKOS, Justice, dissenting.

On May 15, 1972, this Court promulgated Rules of Disciplinary Enforcement as part of its inherent and exclusive power to supervise the conduct of attorneys under Article V Section 10(c) of the Constitution. The Rules were made effective on July 1, 1972, and subject any attorney admitted to the practice of law in this Commonwealth to the exclusive disciplinary jurisdiction of this Court and the Disciplinary Board of the Supreme Court of Pennsylvania.

In particular, exclusive jurisdiction is given to the Court and Board over: "Any attorney who resumes the practice of law, with respect to non-judicial acts while in office as a justice, judge or district justice." Pa.Rule of Disciplinary Enforcement 201(a)(5).

Respondents are all attorneys who seek to resume the practice of law after either being removed from their judicial office (Attorneys A, B, C, F, G, and H) or resigning from judicial office (Attorney D) and who are being subjected to scrutiny by the Board for acts committed while in office as judicial officers. In attempting to implement Disciplinary Enforcement Rule 201(a)(5), the Board determined that it would have jurisdiction in cases concerning those former jurists whose acts were not found to be a violation of the unique responsibilities peculiar to judicial office when the act involves illegality, moral turpitude or pervasive dishonesty.

Thus, the Board dismissed charges against all the former jurists to the extent that their alleged conduct involved receipt of bribe money or their failure to report same, characterizing such acts as judicial acts of misconduct. (Attorneys C, F, and D).

Attorneys' A and B alleged conduct was found to be that they conspired to arrange for favorable treatment of union members (CASE FIXING) and this conduct, if established, would be non-judicial. Attorneys D, G and H were accused of lying to the FBI which, if proven, would also be non-judicial. Accordingly, the Board ruled that disciplinary proceedings could continue as to Attorneys A, B, D, G and H.

The Office of Disciplinary Counsel has sought review of the Board's classification of "non-judicial" acts and the Board's application of that definition to these Respondents' particular circumstances and asks that we give guidance to the Board concerning conduct that is "non-judicial" so that Rule 201(a)(5) can be fully implemented.

The Majority, in rejecting the Board's interpretation of Rule 201(a)(5), today rules that all conduct of a jurist whether it is judicial or not is subject to review only by the Judicial Inquiry and Review Board (JIRB) which has the exclusive authority, in addition to recommending that a jurist be suspended, removed or disciplined as a jurist, to recommending that action be taken against the jurist as an attorney pursuant to the Rules of Disciplinary Enforcement. I strenuously dissent for the following reasons.

Until today, the clear understanding was that we had designated the Disciplinary Board as our official disciplinary organization over attorneys. *Office of Disciplinary Council v. Walker*, 469 Pa. 432, 366 A.2d 563 (1976); *Matter of Leopold*, 469 Pa. 384, 366 A.2d 227 (1976). Our right to regulate the conduct of attorneys stems from Article V, Section 10(c) of the Constitution and, in furtherance of that constitutional grant of power, we promulgated our Rules of Disciplinary Enforcement and created the

Disciplinary Board to bring to our attention attorney conduct which merits discipline by us.

It is true that the recommendation of the Board is not binding on us and that we conduct a *de novo* review of the record compiled by the Board. We have indicated in the past that the Board is merely an extension of this Court which, when concerned with actions for public censure, suspension or disbarment, advises this Court as to its recommendations. The recommendations submitted by the Board are not binding on us, although they are persuasive. *Matter of Leopold,* 469 Pa. 384, 366 A.2d 227 (1976).

The persuasiveness of the findings and recommendations seem to this author to stem from the fact that we have chosen to repose a great deal of trust in our Disciplinary Board to monitor attorney conduct and to alert us to the potential abuses of the professional powers granted to attorneys. In executing this important public function, the Board's expertise and experience makes it better qualified than any other body to recommend to us that discipline of an attorney is warranted. Administratively, this scheme makes sense because all questions concerning the fitness of an attorney to practice before our courts flow through one channel.

This workable system is today abandoned and a new parallel system is installed. JIRB, in addition to its important functions in recommending to us whether jurists are subject to removal, suspension or discipline as jurists, will also recommend whether they should be disciplined as attorneys, thereby imposing upon JIRB the dual burden of interpreting the Rules of Professional Responsibility and the Rules of Disciplinary Enforcement. I see no reason to enlarge the jurisdiction of the JIRB and, to the extent that the Majority premises its decision on the fact that the JIRB can recommend "discipline" to us (including disbarment), I believe the Majority is reaching for a result.

Article V, Section 18(g) provides that, "if, after hearing, the board (JIRB) finds good cause therefor, it shall recommend to the Supreme Court the suspension, removal, disci-

pline or compulsory retirement of the justice or judge." I believe that "discipline" as used in this section refers to discipline as a judge or justice when the other forms of discipline provided (suspension, removal or compulsory retirement) are not appropriate. In no way do I see anything in Section 18 which would contemplate that the JIRB should be concerned with a jurist's future as an attorney, especially when Article V, Section 10 provides the mechanism to discipline former jurists who seek to resume the practice of law.

Instead of attempting to read both of these sections *in pari materia,* and thereby giving effect to both, the Majority now upsets the balance that the Constitution put in place that JIRB should monitor judges and that the Board should monitor attorneys.

It is no coincidence that a majority of attorneys comprise the Board whose voices need to be heard whether one of their own should practice along side with them. This voice will now be muffled as to Respondents because the JIRB is composed of a majority of jurists. It is also no coincidence that jurists should dominate the JIRB, because their voice also needs to be heard when one of their own is accused of judicial improprieties. I am concerned that this carefully thought out balance of peer review is now being replaced with a system that takes away from the bar their opportunity to express their judgment which is based on experience and expertise.

Judges and lawyers are not peers of one another. Today the Court espouses, for the first time ever, that there need not be peer review of lawyers. Will the majority also abrogate peer review of judges in the future. I sincerely hope not.

Turning to the Board's interpretation of what acts are non-judicial in nature, I believe that their view, that non-judicial acts as contemplated by Rule 201(a)(5) are acts committed which are not a violation of the unique responsibilities peculiar to judicial office which involve illegality, moral turpitude, or pervasive dishonesty, is a correct as-

sessment of the types of conduct which should be reviewed by the Board because these same acts subject all attorneys to discipline. As the Majority itself recognizes, the acts of accepting bribes, fixing cases or lying to the FBI are acts also prohibited by Sections 1–102(A)(3) through (A)(6) and 8–101(A)(3) of the Code of Professional Responsibility and would form the basis for disciplinary action. I would affirm the Board's interpretation of the meaning of "non-judicial" acts and direct that they proceed with proceedings against all the Respondents, because all of the charges relate to "non-judicial" acts.

Finally, I would overrule *Office of Disciplinary Counsel v. Surrick*, 521 Pa. 264, 555 A.2d 883 (1989), which is an aberration designed to insulate a miscreant from peer review for acts which were an admitted violation of an attorney's oath of office.