## In re Anonymous No. 85 D.B. 88

Disciplinary Docket No. 85 D.B. 88.

POWELL, *Member,* April 16, 1992—Pursuant to Rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania submits its findings and recommendations regarding the above-captioned petition for discipline.

### HISTORY OF PROCEEDINGS

Respondent was suspended from the practice of law in the Commonwealth of Pennsylvania by Supreme Court order dated August 15, 1988. The order was issued pursuant to Rule 214(d), Pa.R.D.E. and referred to the Disciplinary Board in accord with Rule 214(f), Pa.R.D.E.

Respondent's suspension stemmed from his January 14, 1988, conviction in the U.S. District Court for the

Territory of Guam of the offense of misprision of a felony, in violation of 18 U.S.C. §4.*

On August 18, 1989, respondent was sentenced to pay a fine of $10,000 and perform 200 hours of community service over a period of one year through the [    ] Bar Association.

On September 20, 1989, the Office of Disciplinary Counsel filed a petition for discipline of respondent based on his conviction.

On October 23, 1989, respondent filed an answer to the petition for discipline.

On February 15, 1990, the parties entered into a stipulation of the facts which led to respondent's misprision of felony conviction.

Hearings on the matter were held on February 15, 1990, and March 19, 1990, before Hearing Committee [    ]. The Hearing Committee filed its report on July 25, 1990, and recommended that respondent receive a public censure for his misconduct.

On August 14, 1990, petitioner filed a brief on exceptions to the Hearing Committee report, and requested that respondent be suspended from the practice of law for a period of at least two years.

The matter was adjudicated at the September 1990 meeting of the Disciplinary Board.

---

* Misprision is defined as: "Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined not more than $500 or imprisoned not more than three years, or both."

## FINDINGS OF FACT

We adopt the following findings of fact which were stipulated by the parties:

(1) Petitioner, whose principal office is located at 300 North Second Street, Harrisburg, Pa., is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent, [    ], was born in 1944, and admitted to practice law in the Commonwealth of Pennsylvania in 1974. He resides at [    ] with his wife and two minor children. At all times relevant herein, respondent was a partner in the firm of [A] and his practice was concentrated in municipal bond financing. Except for this proceeding, he has never been subject to discipline.

(3) On January 14, 1988, respondent pled guilty in the U.S. District Court for the Territory of Guam to the offense of misprision of a felony (18 U.S.C. §4). By order dated August 15, 1988, the Supreme Court of Pennsylvania suspended respondent from the practice of law because of his conviction, and directed that the matter be referred to the Disciplinary Board pursuant to Rule 214(f), Pa.R.D.E., for a hearing in which the sole issue to be determined is the extent of final discipline to be imposed. The factual basis for respondent's plea of guilty has been fully set forth in a stipulation and allocution (the "Guam allocution") filed jointly by the United States and respondent at the time of the plea.

## FACTUAL BACKGROUND

(4) Beginning in 1985, [B], executive vice-president of [C], an investment banking firm in New York City, asked respondent to have his law firm act as underwriter's counsel to [C], bond counsel, and/or tax counsel with regard to certain municipal bond issues.

(a) Respondent's law firm was retained, inter alia, to render opinions regarding the tax-exempt status of a number of bond issues for certain governmental entities within the United States, its territories and trust territories, for which [C] was contemplating acting as underwriter.

(b) One of these issues for which respondent's firm acted as underwriter's counsel/bond counsel was the [D] bond issue of October 31, 1985, in the principal amount of $300 million, issued by the [E].

### The [F] Fund

(5) A $4.5 million portion of the proceeds of the [D] bonds was placed in an [F] Fund at [G] Bank. [G] acted as trustee of the [F] and also acted as trustee for the [D] bonds.

(a) The [F] was under the control of [C] and was to be used to advance the development of the projects which were to be financed with the proceeds of the [D] bonds.

(b) To the extent the funds were not expended on the projects, they were to be made available to Guam for public infrastructure costs related to such projects.

(6) During 1985 and 1986, [B] submitted and caused to be submitted to [G] various invoices and requisitions requesting payment, from monies in the [F], for services rendered in connection with the projects to be funded by the [D] bonds. At least two of the invoices and requisitions submitted by [B] to [G] were false and fraudulent, as follows:

(a) An [H] invoice dated January 1, 1986, in the amount of $27,500; and,

(b) An [I] invoice dated March 31, 1986, in the amount of $30,000.

(7) Pursuant to the above false and fraudulent invoices, on or about February 28, 1986, (as to [H]) and May 9, 1986, (as to [I]), [G] paid the amount of the invoices from the [F] as requested by [B]. At the time the invoices were submitted to and paid by [G], however, neither respondent nor his law firm had been asked or were otherwise obligated to review the invoices and/or approve their payment.

(8) [B] caused mailings to be delivered in Guam for the purpose of executing this scheme. At the time, however, [B] had not revealed to respondent, and respondent had no reason to believe and was not otherwise aware of, [B's] fraudulent activities.

(9) On or about November 15, 1986, respondent first discovered or had reason to believe that the [H] and [I] invoices were false and fraudulent.

(a) Respondent immediately notified both [J], the chairman and chief executive officer of [C], and [K], Esq., outside counsel to [C], of his concerns about the invoices, and sent copies of the relevant documents to [K] by telecopier on November 19, 1986.

(b) Respondent failed, however, to report [B's] actions to the appropriate authorities under the law of the United States.

(10) In addition, in two letters to [E] dated November 15 and 30, 1986, discussing other aspects of the [B] Bonds, respondent did not advise [E] of his discovery of or suspicion about [B's] activities.

## *[L] & [M] Credit Union*

Shortly before the closings in December 1985 of additional bond issues for which respondent's law firm had been retained to act as counsel, as indicated in paragraph 4 above, [B] told respondent that proceeds from the sale of the bonds would be invested with [L].

(a) [L] was represented to respondent by [B] (who is also an attorney) to be an offshore bank duly licensed in the Commonwealth of the Northern Mariana Islands, sufficiently capitalized under applicable law, and authorized to undertake such transactions.

(b) [N], a "municipal finance consultant" associated with [C] and operating in concert with [C] and [B], represented himself as chairman of [L].

(c) At that time in 1985, neither [B] nor [N] revealed to respondent, and respondent had no reason to believe and was not otherwise aware, that, in fact, [L] had no assets and was not a duly licensed banking corporation.

(12) The new Tax Reform Act of 1986, then under consideration by Congress (but not yet passed) provided that certain municipal bonds would be required to have been issued before December 31, 1985, in order to avoid application of certain new restrictive provisions of the act.

(13) The December 31, 1985, effective date for certain restrictive provisions of the act was to apply to some of the bond issues for which [B] in December 1985 requested that respondent's law firm act as bond counsel and/or underwriter's counsel, and for which [C] was the underwriter.

(14) [C] purchased the entire amount of those bonds using checks which appeared on their face to have been drawn on a [C] account at [M] Credit Union (of which [B] was the chairman). These December 31, 1985, bond

transactions involved seven issues totaling over $600 million. However, [B] did not reveal to respondent at the time, and respondent had no reason to believe and was not otherwise aware, that the [C] checks issued to purchase the bonds would neither be negotiated by presentation and deposit, nor covered by adequate funds in [C's] account at [M].

(15) In the spring and summer of 1986, [B] and others at [C] asked respondent's law firm to act as bond counsel and/or underwriter's counsel for other bond issues for which [C] was the underwriter.

(16) The deadline by which certain municipal bonds had to be issued in order to avoid application of certain restrictive provisions of the Act (which was still under consideration by Congress), by joint statements by both houses of Congress, had been extended to August 31, 1986.

(17) The August 31, 1986, effective date for certain restrictive provisions of the Act applied to certain of the bond issues for which [B] in the spring and summer of 1986 had requested that respondent's law firm act as bond counsel and/or underwriter's counsel.

(18) [C] purchased the entire amount of those bonds using checks which appeared on their face to have been drawn on the [C] account at [M]. The proceeds were then purportedly invested with [L]. These 1986 bond transactions involved six issues totaling over $1.4 billion. At such times in 1986, neither [B] nor [N] revealed to respondent, and respondent had no reason to believe and was not otherwise aware, that [L] had no assets and was not a duly licensed banking corporation. [B] also did not reveal to respondent (nor did anyone else reveal to respondent), and respondent had no reason to believe and was not otherwise aware that the [C] checks issued to purchase the bonds would neither be negotiated by pres-

entation and deposit nor covered by adequate funds in [C's] account in [M].

(19) The government has alleged that the "size" of the bond issues mentioned in paragraphs 14 and 18 had been inflated by the obtaining by [B] and [N] of false and fraudulent feasibility studies, which falsely stated the need for such large issues, when [B] and [N] knew that the objectives and projects to be financed by these issues would not be accomplished. The government has acknowledged, however, that in rendering opinions and advice at various times concerning bond issues underwritten by [C], respondent reasonably relied on feasibility studies and reports obtained by [B] and others which clearly made it appear that the proposed projects were feasible and likely of success. Respondent did not know at any time, and did not have reason to suspect until the return of indictments against [B] and [N] in January 1988, that such feasibility studies and reports contained false and misleading statements and may have been obtained by [B] and others through fraud, collusion, and other improper conduct.

(20) The government has further alleged that [B] and other officials at [C] engaged in these deceptions, which they advanced by use of the U.S. mail and various wire communications, in order to:

(a) Create the appearance that these bonds had been issued on or before December 31, 1985 or August 31, 1986, and were therefore not subject to certain restrictive provisions of the act that took effect on those dates;

(b) Fraudulently persuade investment therein with [C], the apparent owners, by members of the public based on the purported tax-exempt status of the bonds; and,

(c) Obtain for [C] the proceeds from their remarketing of these bonds for investment in higher yield securities.

The government has further acknowledged, however, that the professional legal assistance provided by respondent and his law firm in unwitting furtherance of the schemes of [B] and [N], by the performance by respondent and his firm of services as bond counsel, underwriter's counsel, tax counsel or otherwise concerning the issuance and remarketing of the bond issues underwritten by [C], was without any criminal knowledge or intent on the part of respondent.

(21) After the closing and remarketing of all of the bonds underwritten by [C] for which respondent's law firm had acted as bond counsel and/or underwriter's counsel, respondent discovered or had reason to suspect:

(a) That [L] was not and had not been a duly licensed and legitimate banking corporation and sufficiently capitalized at the relevant times:

(b) That [C] did not have and had not had adequate funds in its account at [M] to pay the checks drawn on its account to purchase the bonds;

(c) That the checks had not been negotiated by presentation and deposit.

(22) The facts set forth in paragraphs 11 through 20, above, of which respondent was unaware at the time they occurred, raised questions concerning the tax-exempt status of the bonds.

(23) After the issuance and remarketing of the bonds underwritten by [C] discussed herein, and upon learning of or reasonably suspecting the facts set forth above, respondent was on notice and had reasonable knowledge that [N], [B], and possibly others had devised a scheme to defraud in connection with said bonds. Respondent, however, failed to report such facts to the appropriate authorities under the law of the United States and concealed such facts.

*The Guilty Plea and Sentence*

(24) On January 14, 1988, pursuant to a plea agreement with the U.S. attorney, respondent pled guilty in the U.S. District Court for the Territory of Guam to one count of misprision of a felony (18 U.S.C. §4) concerning the above-related matters.

(25) On August 18, 1989, respondent was sentenced pursuant to his plea of guilty to pay a fine of $10,000, and to perform 200 hours of community service over a period of one year through the [    ] Bar Association.

(26) Respondent has taken no appeal from the conviction and sentence. He has paid the fine in full and is presently working on several research projects in fulfillment of his community service obligation, including projects for Neighborhood Legal Services and directly for the [    ] Bar Association.

## CONCLUSIONS OF LAW

(1) Respondent's conviction for misprision of a felony, in violation of 18 U.S.C. §4, is a conviction under Rule 214(d), Pa.R.D.E.

(2) Respondent's conviction constitutes a per se independent basis for discipline under Rule 203, Pa.R.D.E.

## DISCUSSION

Respondent's criminal conviction resulted in his August 1988 suspension from the practice of law, and is grounds for discipline under Pennsylvania Rules of Disciplinary Enforcement. The instant matter is therefore properly before the Disciplinary Board on the issue of the appropriate disciplinary sanction to be imposed upon respondent in light of his conviction.

Petitioner has requested that the Disciplinary Board additionally find respondent in violation of four Disciplinary Rules. It is respondent's contention, however, that because Rule 203, Pa.R.D.E. provides a basis for the imposition of discipline, we are precluded from further inquiry into possible Disciplinary Rule violations. Because this particular issue has not yet been raised in the Pennsylvania disciplinary system, we will address respondent's objections and the additional Disciplinary Rule violations alleged by petitioner.

Respondent raises a novel point which defies a "plain language" interpretation of Rule 203, Pa.R.D.E. Because Rule 203, Pa.R.D.E. states on its face that a respondent's criminal conviction constitutes an "independent basis" for the imposition of discipline, one may infer that the word "independent" means separate, and therefore, provides the Disciplinary Board with an additional ground for sanctioning the attorney. We therefore conclude that merely because Rule 203, Pa.R.D.E. provides an independent basis for the imposition of discipline, the Disciplinary Board is not precluded from further inquiry into additional Disciplinary Rule violations. This conclusion is supported by the fact that disciplinary matters are heard de novo at every stage of adjudication. See *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986). Although respondent's argument defies a plain language interpretation of Rule 203, Pa.R.D.E., it is buttressed by the fact that the matter was referred to the Disciplinary Board pursuant to Rule 214(f), Pa.R.D.E., which requests the board to determine the appropriate disciplinary sanction, not Rule 214(d), Pa.R.D.E., which enables the Supreme Court to issue a temporary suspension until final disposition of the disciplinary aspects of the case. Lacking a clear mandate because of the apparent conflict between Rules 203, Pa.R.D.E. and 214(f),

Pa.R.D.E., we will proceed to address the additional violations alleged by petitioner.

The Office of Disciplinary Counsel averred in the petition for discipline that respondent engaged in "illegal conduct involving moral turpitude" in violation of D.R. 1-102(A)(3). The Pennsylvania Supreme Court has characterized moral turpitude as "anything done knowingly contrary to justice, honesty, principle, or good morals." *Office of Disciplinary Counsel v. Simon,* 510 Pa. 312, 507 A.2d 1215 (1986). Petitioner offered respondent's plea agreement in support of its contention respondent engaged in illegal conduct involving moral turpitude. However, the plea agreement includes a stipulation of facts which states that respondent had no reason to believe he was not dealing with a duly licensed banking corporation at the time the organization engaged in its fraudulent schemes, and that respondent's legal assistance was rendered "without any criminal knowledge or consent." Because respondent and the U.S. attorney agreed that respondent lacked the requisite knowledge mentioned in *Simon,* he was unable to engage in illegal conduct involving moral turpitude. Accordingly, respondent did not violate D.R. 1-102(A)(3).

Additionally, the United States' agreement that respondent rendered legal assistance without criminal knowledge or consent would also preclude a finding of a D.R. 1-102(A)(4) violation, as alleged by petitioner, because one would need to realize he was engaging in dishonest, fraudulent, deceitful, or misrepresentative conduct in order to knowingly participate in such deception. We therefore conclude D.R. 1-102(A)(4) was not violated by respondent.

Petitioner further alleged that respondent's conduct was prejudicial to the administration of justice. D.R. 1-102(A)(5) is violated when an attorney is convicted of

a serious crime. *Office of Disciplinary Counsel v. Simon,
supra.* However, in the instant matter, respondent was
convicted for actions which do not constitute a crime
under Pennsylvania law. In no way does a recognition
that respondent's conduct was not criminal in Pennsylvania
diminish the fact he pled guilty to a crime against the
United States. Rather, it is merely an acknowledgment
that respondent's conviction of a less egregious criminal
offense is distinguishable from the conduct referred to
in *Simon.* We therefore conclude that although respondent
committed a crime against the United States, his conviction
does not warrant a finding that D.R. 1-102(A)(5) was
violated.

Petitioner's final contention is that respondent's conduct
violated D.R. 1-102(A)(6) because it adversely reflected
upon his fitness to practice law. Although any criminal
conviction is certainly not a testament to the respondent's
fitness to practice law, we conclude that in rare instances
the nature of the conviction and surrounding circumstances
may indicate respondent's continued fitness to practice.
Respondent's conduct in the instant matter was not laud-
able, but it was also not the intentional, knowing par-
ticipation in illegal acts; cf. *Simon* at 1220. Because
respondent did not knowingly engage in criminal conduct,
and there is no allegation whatsoever that he participated
in the underlying felony which gave rise to his misprision
conviction, we conclude that he did not violate D.R. 1-
102(A)(6).

Having determined that respondent did not violate the
four Disciplinary Rules charged in the petition for dis-
cipline, it is now incumbent upon the Disciplinary Board
to ascertain the appropriate disciplinary sanction since
his conviction provides a basis for discipline under Rule
203, Pa.R.D.E. In deciding the disposition of the instant
matter the Disciplinary Board must "consider the events

which surrounded the criminal charge in order 'to weigh the impact of the conviction upon the measure of discipline.'" *Office of Disciplinary Counsel v. Eilberg,* 497 Pa. 388, 441 A.2d 1193 (1982), quoting *Office of Disciplinary Counsel v. Troback,* 477 Pa. 318, 383 A.2d 952 (1978).

As aforementioned, the critical facts surrounding respondent's conviction are his lack of knowledge of or participation in the underlying felony which gave rise to the misprision conviction, and his lack of knowledge of his client's illegal conduct at the time he was furnishing legal services. These crucial factors and the unique nature of the misprision offense lead us to the conclusion that, although respondent engaged in conduct which led to his 1988 suspension from the practice of law, his conduct was not so egregious as to warrant disbarment.

In light of these facts, the nature of respondent's offense, respondent's previously unblemished disciplinary history, and the extensive testimony attesting to his excellent reputation for veracity and integrity, we conclude that a three-month suspension from the practice of law will protect the interests of the public and maintain the integrity of the bar. See *Office of Disciplinary Counsel v. Stern,* 515 Pa. 68, 526 A.2d 1180 (1987).

## RECOMMENDATION

The Disciplinary Board of the Supreme Court recommends that respondent be suspended from the practice of law in the Commonwealth of Pennsylvania for a period of three months, retroactive to the August 15, 1988, Supreme Court order suspending him from practice. The board recommends further that respondent be directed to pay the necessary expenses incurred in the investigation and prosecution of this proceeding.

40

Ms. Lieber recused herself.

Ms. Heh did not participate in the adjudication.

## ORDER

Rule to show cause entered by this court on March 13, 1991, is discharged. It is hereby ordered that respondent be and he is suspended from the bar of this Commonwealth for a period of three years, retroactive to August 15, 1988, and he shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice Zappala and Mr. Justice Papadakos did not participate in the consideration or decision of this case.

Mr. Chief Justice Nix dissents and would enter an order of disbarment.